306 F.2d 22
 Hazel BATHORY, Plaintiff-Appellee,
v.
The PROCTER & GAMBLE DISTRIBUTING COMPANY, Defendant-Appellant.
Hazel BATHORY, Plaintiff-Cross Appellant,
v.
The PROCTER & GAMBLE DISTRIBUTING COMPANY, Defendant-Cross Appellee.
 Nos. 14511-14512.
 United States Court of Appeals Sixth Circuit.
 June 26, 1962.
 
 Judson L. Levin and Saul M. Leach, Detroit, Mich., for Hazel Bathory.
 G. Cameron Buchanan, Detroit, Mich. (William L. Blum, Thomas S. Calder, Cincinnati, Ohio, on the brief), for Procter & Gamble Distributing Co.
 Before MILLER, Chief Judge, and O'SULLIVAN, Circuit Judge.
 O'SULLIVAN, Circuit Judge.
 
 
 1
 In the United States District Court at Detroit, plaintiff-appellee, hazel Bathory, obtained a $5,000.00 jury verdict for injuries which she claims she suffered from using a permanent wave lotion called Pin-It, distributed by defendant-appellant Procter & Gamble Distributing Company. This is a diversity action; Michigan law applies. The complaint, in separate counts, alleged breach of warranty and negligence. The breach of warranty count was dismissed on defendant's motion. The case was submitted to the jury on the negligence count. Defendant appeals from the judgment entered on the veridct. It charges that a verdict should have been directed for it on the grounds, First, that there was not evidence from which the jury could find that plaintiff's use of Pin-It was a proximate cause of her injuries, and Second, that plaintiff's evidence did not make out a jury question as to defendant's negligence.
 
 
 2
 Defendant rested its case on plaintiff's proofs. Their sufficiency to make out a case is, on this appeal, viewed in the light most favorable to plaintiff-appellee. Pomeroy v. Dykema, 256 Mich. 100, 101, 239 N.W. 342; Sitta v. American Steel and Wire Division of United States Steel Corporation,254 F.2d 12, 15 (CA 6, 1958).
 
 
 3
 Plaintiff on or about February 1, 1955, purchased the Pin-It preparation from a Michigan retailer who had purchased it from defendant. The product involved was manufactured by the Procter & Gamble Company. Defendant is a wholly owned subsidiary of that company, and acquires and distributes all of Procter & Gamble Company's products under an exclusive franchise agreement. The parent and subsidiary are both Ohio corporations with head offices in Cincinnati, Ohio. Both have the same President.
 
 
 4
 Shortly after purchasing the accused Pin-It, plaintiff applied it to her hair and scalp, conforming to the directions supplied on the package. These instructions outlined various steps to be taken, such as shampooing and trimming the hair, two applications of the lotion, attaching pins and curlers, and a final rinsing and drying of the hair. These steps were taken at stated intervals and the entire procedure extended over several hours. Immediately upon the first application of the lotion, plaintiff experienced a burning sensation of her scalp. This sensation continued, and increased, during the hours consumed in her observance of the instructions. The last steps were the removal of the pins and curlers and brushing out the hair. When plaintiff did so, the brushing brought about an immediate and substantial loss of hair. For some weeks following plaintiff's use of Pin-It her symptoms persisted-- irritation and burning of the scalp, development of red blotches thereon and continued loss of hair. Toward the end of February she consulted her doctor, a general practitioner, who referred her to a dermatologist, Dr. Arthur Schiller. Dr. Schiller first saw plaintiff on February 26, 1955. He did not observe any inflammatory condition of plaintiff's scalp at that time, but from the appearance of glands in her neck concluded that there had been such inflammation. He found serious thinning of the hair which he characterized as a male pattern baldness, '* * * the hair was rather thin. There was a central baldness covering almost the entire vertex. And the hairs in themselves over this area were distinctly thinner than hairs on the back of the head.' Doctor Schiller treated plaintiff over a period of months. The record on appeal does not disclose the duration of plaintiff's difficulties or their end result. It is not claimed that the verdict was excessive.
 
 
 5
 At some time less than ten days after plaintiff used the lotion, she wrote directly to the Procter & Gamble Company advising them of the difficulties that resulted from her use of Pin-It. That company replied, stating that they had had no previous complaints concerning Pin-It. Plaintiff testified that she had never had any previous scalp or other skin trouble and had not experienced any abnormal loss of hair. She had shampooed her hair many times and used various permanent wave lotions without ill effects.
 
 
 6
 Prior to trial, plaintiff's counsel submitted to the Detroit Testing Laboratories a sample of the Pin-It lotion used by plaintiff. The report obtained from that organization stated that the lotion contained 1.8% thioglycollic acid and 2.5% total alkali as calculated with sodium oxide and a negligible amount of ash. It further stated:
 
 
 7
 'This laboratory wishes to point out that the amount of thioglycollate present should not ordinarily cause irritation or bad results to the normal individual. However, misuse of the material such as leaving on the hair too long increases the concentration of the thioglycollate so that it may act as a primary irritant. Moreover, there may be an individual involved who happens to have an allergy or sensitivity to this type of material.'
 
 
 8
 Two chemists who had collaborated in making the tests and the above report testified for plaintiff. One of them stated that thioglyvcollic acid, 'has a certain amount of irritant properties'; that this acid has a tendency to decompose to become hydrogen sulfide, 'which has irritant properties to it'; that this 'thioglycollic acid is an irritant'; that he 'would expect thioglycollic acid to have irritant properties'; and 'I would expect the total alkali calculated as sodium oxide with a concentration of 2.5% in itself to act as an irritant' and 'coupled with the fact that there is a mixture of the total alkali with thioglycollic acid * * * would * * * make this react as an irritant.'
 
 
 9
 The other chemist gave her opinion that 'thioglycollic acid is sometimes an irritant to the scalp'; that '2.5% alkali, total alkali, is a rather high content of total alkali and can be very irritating to the skin and scalp of an individual.' On cross examination, she said that it was her conclusion 'that the thioglycollic acid content present could cause the irritation.'
 
 
 10
 The validity of the opinions of these chemists was weakened and discrepancies therein exposed by cross examination and by the seeming contradiction of their court testimony by what was said in their written report given before trial that, 'This laboratory wishes to point out that the amounts of thioglycollate present should not ordinarily cause irritation or bad results to the normal individual.' It was for the jury, however, to weigh the evidence, to determine the credibility of these witnesses and to cull the truth out of these seeming contradictions. O'Donnell v. Geneva Metal Wheel Co.,183 F.2d 733 (CA 6, 1950); Dickerson v. Shepard Warner Elevator Co., 287 F.2d 255, 259 (CA 6, 1961); Wilkerson v. McCarthy, 336 U.S. 53, 69 S.Ct. 413, 93 L.Ed. 497 (1948).
 
 
 11
 Plaintiff's witness, the dermatologist, Dr. Arthur Schiller, in answer to a long, hypothetical question, concluded that:
 
 
 12
 'The fact that, hypothetically, the preparation was used that contained 1.8% thioglycollic acid and 2.5% of alkali, certainly within the bounds of these percentages the hydrogen ion content after it was diluted could readily have been high enough to cause an irritation.'
 
 
 13
 In answer to a question, 'Might or could this combination of properties cause a triggering mechanism in a person such as the hypothetical person that I have described to you, to cause her to have an abnormal loss of hair * * * the question is, can this type of an irritant that you have described trigger the mechanism for an abnormal loss of hair over a period of months?' the dermatologist, Dr. Schiller, said, 'It would absolutely be possible.' He likewise testified, as part of his answer to the hypothetical question, 'It is altogether possible for a cold wave to cause an irritation of the scalp' and 'I think that almost any type of preparation under certain circumstances could cause loss of hair.' Dr. Schiller also testified that a person could experience an increased loss of hair from the use of shampoo, soap or water.
 
 
 14
 1) Proximate cause. Defendant argues that all of the above evidence does not add up to a case for the jury as to whether Pin-It was a proximate cause of plaintiff's injuries. It places much reliance on our case of Sheptur v. Procter & Gamble Distributing Co., 261 F.2d 221, 79 A.L.R.2d 476 (CA 6, 1958). In that case, we held that a jury could not find that Tide was the cause of a plaintiff's hand dermatitis. There, the plaintiff had been washing dishes in hot water over a period of time with various detergents, including Tide. There was no evidence isolating Tide from other soaps as a possible cause of injury. Such is not the case before us. Although Dr. Schiller said shampoo, hot water and other agencies could cause a loss of hair, the plaintiff here had for many years shampooed her hair and had used various wave lotions without any untoward results. The process which almost immediately caused a burning and irritation of her scalp contained no new element except the use of the Pin-It. There was professional evidence that the chemical content of the lotion was such that it might be the cause of irritation to the scalp. Plaintiff's doctor testified that the lotion could readily cause an irritation, and that it was 'absolutely' possible that the lotion could 'trigger' an abnormal loss of hair. We think that the total of this evidence and the justifiable inferences that could be drawn therefrom were adequate to permit a finding that Pin-It was the proximate cause of plaintiff's trouble. We believe that the facts in this case lead with equal facility and logical sequence to a justified conclusion that the injury was proximately caused by the product as did the facts found sufficient for such purpose in the case of Gerkin v. Brown & Sehler Co., 177 Mich. 45, 53-54, 143 N.W. 48, 48 L.R.A.N.S., 224.
 
 
 15
 Citing Sheptur v. Procter & Gamble Distributing Co., supra; Kaminski v. Grand Trunk Western Railroad, 347 Mich. 417, 79 N.W.2d 899; and Cole v. Simpson, 299 Mich. 589, 1 N.W.2d 2, defendant argues that plaintiff's evidence merely disclosed a possible cause that was equiponderant with other possible causes of her injury. In Sitta v. American Steel & Wire Division of U.S. Steel Corp., 254 F.2d 12 (CA 6), we said:
 
 
 16
 '* * * where the circumstances are such as to take the case out of the realm of conjecture and within the field of legitimate inferences from established facts, at least a prima facie case is made.'
 
 
 17
 In Kaminski v. Grand Trunk Western Railroad, supra, the Michigan court quoted from a generally accepted definition of causation contained in the case of City of Bessemer v. Clowdus, 261 Ala. 388, 74 So.2d 259. The Alabama court in that case stated the general rule that if evidence discloses several causes of an event without any plausible reason for selective choice of any of them, a case of proximate cause is not made; such court, however, concluded:
 
 
 18
 'On the other hand, if there is evidence which points to any one theory of causation, indicating a logical sequence of cause and effect, then there is a juridical basis for such a determination, notwithstanding the existence of other plausible theories with or without support in the evidence.'
 
 
 19
 The evidence in this case logically points to Pin-It as a likely cause of plaintiff's trouble. The proofs exposed no other possible cause with plausibility equal to that attaching to Pin-It.
 
 
 20
 Defendant emphasizes that plaintiff's professional evidence amounted only to assertions that Pin-It might, could, or may possibly have been the cause involved, and quotes language from decisions to the effect that such evidence has little probative value. Such language must be read in the factual context of the cases wherein it is employed. No Michigan case, however, has held that proof of causation is insufficient because the testimony is phrased in terms of 'might' or 'could be.' Michigan lawyers, for many years, were forbidden to ask doctors whether an event 'did' cause an injury and were limited to casting their questions in the 'might' or 'could be' style, lest a direct answer that it 'did' cause the injury should invade the province of the jury. DeHaan v. Winter, 258 Mich. 293, 241 N.W. 923; DeGroot v. Winter,261 Mich. 660, 671, 247 N.W. 69. See also Fontana v. Ford Motor Co., 278 Mich. 199, 208, 270 N.W. 266, as to the sufficiency of such 'might or 'could be' opinion evidence to raise an issue of fact for a jury. The restrictions of this long time Michigan rule were relieved when Section 16 was added to Michigan Court Rule 37 in 1957 (349 Mich. xiii). Now an expert's opinion may be more positive and will not be objectionable because 'it embraces the ultimate issue or issues to be decided by the trier of the fact.' The adoption of this rule did not, however, destroy the sufficiency of opinions cast in terms of possibility or in the 'might' or 'could be' style. Yates v. Wenk,363 Mich. 311, 109 N.W.2d 828.
 
 
 21
 Defendant's counsel asserts that his objection to a hypothetical question propounded to plaintiff's witness Dr. Schiller should have been sustained because the question did not include the admitted fact that forty-five minutes after the initial application of Pin-It, plaintiff rinsed her hair with water. When the objection was made, there was a discussion as to whether plaintiff had testified that she had so rinsed her hair. Plaintiff's counsel claimed there was no such evidence in the record. Defendant's counsel asserted that there was. The District Judge expressed his recollection to be the same as that of plaintiff's counsel, but suggested, 'We could check the record on it.' Defendant's counsel replied, 'I am willing to accept the record that way if counsel wants it that way.' Later checking of the record sustained defendant's counsel's recollection that plaintiff had testified to a rinsing of her hair as claimed. Aside from whether the objection was waived by counsel, we are of the opinion that the omission of the fact of rinsing from the hypothetical question was of little importance. The witness was not asked on cross-examination whether his opinion would have been any different had the omitted fact been included in the question. In Dickerson v. Shepard Warner Elevator Co., 287 F.2d 255, 260 (CA 6, 1961), in discussing the omission of a proven fact from a hypothetical question, we stated that where 'it cannot be said that the omitted fact was an integral or necessary part of the factual premise to the expert's conclusion, it is not essential that such fact be included in the question.' Michigan Court Rule 37, 16 (349 Mich. xiii) referring to opinions of experts, says, in part, 'The witness may state his opinion and the reasons therefor without first specifying data on which it is based, but upon cross-examination, he may be required to specify such data.' in a note to the above rule, the author of Michigan Court Rules, Annotated, referring to testimony by experts, says, 'An erroneous factual assumption should not disqualify such testimony, without the further showing that a correct factual assumption would have changed his opinion.' Honigman's Michigan Court Rules, Annotated, rule 37. The omission in question did not destroy the probative value of Dr. Schiller's expert opinion.
 
 
 22
 2) Was there evidence of actionable negligence? Defendant asserts that plaintiff's evidence failed to make a case for the jury as to defendant's negligence. It argues that a distributor of a product, without notice or knowledge of any negligence in its manufacture or that such product was likely to injure a user of it, cannot be charged with negligence. A count charging breach of warranty having been dismissed, plaintiff must recover, if at all, upon a finding of negligence chargeable to defendant. Such a charge of negligence cannot, in the context of this case, be sustained unless there was evidence of negligence in the manufacture of Pin-It, and a factual situation out of which such negligence can be charged to defendant.
 
 
 23
 a) Was there negligence in the manufacture of Pin-It? We are of the opinion that there was evidence from which the jury could find negligence in the manufacture of Pin-It. The manufacturer knew that it was making a product intended to be applied to the human body; that such product contained chemicals of such strength and kind as to effect a change from the normal in a part of the human body-- in this instance, the hair. To accomplish the desired cosmetic change, the chemically laden preparation had to be applied to the human scalp. Certainly Pin-It was such a product that, if negligently made, could be reasonably calculated to cause injury. The maker of such a cosmetic has a duty to its intended users to take precautions against introducing into it chemicals of a composition likely to cause harm to a normal person using it in strict conformity to the instructions for its use. There was evidence from which the jury could find that plaintiff was injured by the use of Pin-It, and that such lotion contained chemicals known to be irritants which could inflict the injury complained of. Where a chattel which would be imminently or inherently dangerous if defectively manufactured, is so made, negligence of the maker may be inferred. This is the rule in Michigan as elsewhere. Hertzler v. Manshum, 228 Mich. 416, 200 N.W. 155; Pierce v. C. H. Bidwell thresher Co., 153 Mich. 323, 116 N.W. 1104; Macres v. Coca Cola Bottling Co., 290 Mich. 567, 575, 576, 287 N.W. 922; Sitta v. American Steel & Wire Division of U.S. Steel Corp., 254 F.2d 12 (CA 6, 1958); Pattinson v. Coca Cola Bottling Company, 333 Mich. 253, 52 N.W.2d 688; Ebers v. General Chemical Co., 310 Mich. 261, 276, 17 N.W.2d 176; MacPherson v. Buick Motor Co., 217 N.Y. 382, 111 N.E. 1050, L.R.A.1916F, 696; Thornhill v. Carpenter-Morton Co., 220 Mass. 593, 108 N.E. 474; Restatement of Torts, 395, 397.
 
 
 24
 b) Is defendant, as a distributor, chargeable with manufacturer's negligence? The resolution of this question is not free from difficulty. As a general rule, a vendor who acquires for resale a product in the open market from a responsible manufacturer is not liable for its negligent manufacture, absent such vendor's knowing, or having reason to know, of the dangerous character of the product which he sells. Clement v. Rommeck, 149 Mich. 595, 113 N.W. 286, 13 L.R.A.,N.S., 382; Pesavento v. E. I. DuPont DeNemours & Co., 240 Mich. 434, 215 N.W. 330; Camden Fire Insurance Co. v. Peterman, 278 Mich. 615, 270 N.W. 807; Elizabeth Arden v. Brown, 107 F.2d 938 (CA 3, 1939); Sears, Roebuck & Co. v. Marhenke, 121 F.2d 598 (CA 9, 1941); Restatement of Torts (1948 Supp.) 402. In this case, there was no evidence of previous injuries from the use of Pin-It, nor any direct proof that defendant Procter & Gamble Distributing Company was aware of the chemical content of the product Pin-It.
 
 
 25
 We think, however, that the facts of this case make the above general rule inapplicable here. The defendant, bearing the corporate name Procter & Gamble Distributing Company, was a wholly-owned subsidiary of Procter & Gamble Company, presumably the manufacturer of Pin-It. The parent and subsidiary are both Ohio corporations, having their principal places of business in cincinnati, Ohio. Both have the same President. A contract between the subsidiary and parent provided that Procter & Gamble Company (parent) agreed to sell, and defendant Procter & Gamble Distributing Company (subsidiary) agreed to buy, all the products manufactured by Procter & Gamble Company and also the products acquired by Procter & Gamble Company from the Procter & Gamble Manufacturing Company (apparently another member of the Procter & Gamble corporate family). The contract, however, fixed a minimum of thirty million units and a maximum of eighty million units that were to be the subject matter of the mentioned contract. The parent had the right to designate the number of units to be sold. The place of delivery of all products was at the respective plants of the Procter & Gamble Company and the Procter & Gamble Manufacturing Company. The price that defendant, as distributor, was to pay to the Procter & Gamble Company for such goods was to be the defendant's selling price less its costs, and defendant was to receive from the parent a credit of five cents per unit on all products sold. Defendant agreed that it would not, without Procter & Gamble Company's consent, engage in the sale of any products other than those sold to it by such company.
 
 
 26
 We are of the opinion that the facts recited must be held to deny this defendant the insulation from liability that ordinarily protects a retailer or distributor. Rules of law are founded on reason, and when there is no basis in reason to apply an abstract rule of law to a particular factual situation, that rule will not apply. Mere employment of a label 'distributor' will not, by force of such label alone, carry with it the protection of the general rule we speak of. When the rule is applied, a retailer or distributor is protected because of his having purchased in the open market a product made and sometimes packaged by another, and because under such circumstances he has the right to assume that the product is not dangerous to the intended users thereof. The product involved here, Pin-It, was not purchased by defendant in the open market. Defendant, itself, was the only market from and through which the manufacturer moved its goods into the channels of trade. Manufacturing is not an end in itself. The process contemplates that the goods produced will be sold to consumers. Defendant's sole reason for being is to distribute Procter & Gamble products. It is no more than an arm, the marketing arm, of the overall Procter & Gamble enterprise. We do not think that one department of a manufacturing and selling enterprise which puts a dangerous product into the channels of trade can escape liability by saying that it did not know what another department of such an integrated operation was doing. This is emphasized by the fact that the operations of both of such departments (although enjoying separate corporate existence) are presided over by the same chief executive. The reasons for the rule protecting a retailer or distributor from liability for negligence under certain circumstances thus do not exist in this case. We deal only with the facts peculiar to this case in holding that it was for the jury to decide whether the defendant, distributor, as the District Judge charged, 'knew or should have known that its product if used as directed or recommended by it, would cause or be likely to cause such (plaintiff's) injury.'
 
 
 27
 No Michigan case has been cited to us on the precise point under discussion, nor do we find any by our own research. The Fifth Circuit decision in the case of Blitzstein v. Ford Motor Co., 288 F.2d 738, bears some analogy. There an automobile called an 'Anglia' or 'English Ford' was manufactured by an English company, 54.6 percent of whose stock was owned by the Ford Motor Company, (referred to as the American Company). One such car was negligently made with a crack in the gas tank, which defect was charged as the cause of the plaintiff's injury. Ford Motor Company purchased such cars for its American market from the English company, Ford Motor Company, Ltd., and sold them, describing them as English cars, the product of the English Company. There was evidence that the English car, in addition to the defect in the gas tank of the particular car involved, was negligently designed so that gas leaking from the tank accumulated in the trunk of the car involved, vaporized under the heat of the sun, and exploded. Without extended discussion of the point, and indicating that small crack in the gas tank would not be revealed by a reasonable inspection, the Court of Appeals, in holding that a verdict should not have been directed for defendant Ford Motor Company, said:
 
 
 28
 'We think that a jury could reasonably have found that the American Ford Company was negligent in marketing a product which was inherently dangerous, of which danger it should have been aware from its long experience in the design and manufacture of automobiles, and that American Ford failed to exercise reasonable care to inform the buying public of this dangerous condition.'
 
 
 29
 Likewise, with little discussion of the point here involved but in a similar context, the Ohio Supreme Court sustained a judgment for a plaintiff injured by use of a hair dye. Sicard v. Roux Distributing Co., 133 Ohio St. 291, 300, 301, 13 N.E.2d 250, 254. In that case defendant was a distributor and sought the protection given to retailers and distributors. The fact, however, that defendant, Roux Distributors Company, was apparently the only distributor of the products of the manufacturer, Roux Laboratories, Inc., prompted the Ohio court to say:
 
 
 30
 'It is urged * * * that inasmuch as he was only the distributor and not the manufacturer, he should not be held liable for any defect or injurious substance in the hair dye known as Roux Shampoo Tint. It is also urged that since the product was sold in package form that he should not be held liable any more than a retail druggist who might have sold it over the counter. * * * The defendant here was not a mere retailer who sold the hair dye to the plaintiff in package form. The defendant was the distributor for the manufacturer of Roux Shampoo Tint. * * *
 
 
 31
 'Since neither the defendant nor any of his agents or employees testified in the case, the record does not reveal whether the defendant had any interest in Roux Laboratories, Inc., the manufacturer of Roux Shampoo Tint. However, there is enough evidence in the record from which the jury could properly conclude that the defendant, as distributor, not only knew, or should have known, the character and composition of the product being sold, but also that there was a general representation to the public by the defendant that Roux Shampoo Tint, if used according to directions, was safe and proper in every respect.'
 
 
 32
 To conclude our discussion of whether defendant in this case is insulated from liability for negligence, we call attention to the general tort rule that 'one who puts out as his own product a chattel manufactured by another is subject to the same liability as though he were its manufacturer.' Restatement of Torts, 400. In this case, the package which contained the accused lotion did not display the exact and full name of any one of the corporations that make up the Procter & Gamble enterprises. The sole identification on the package consisted of the words 'Procter & Gamble's' with the small print notation 'Made in U.S.A. by Procter & Gamble, Cincinnati, Ohio.' The use of the words 'Procter & Gamble's' was to give some identification of the origin of the product. Such words were just as descriptive of defendant Procter & Gamble Distributing Company as they would be of the Procter & Gamble Manufacturing Company or of the Procter & Gamble Company. A jury would clearly be justified in finding that defendant was using its own name to market the product. Swift & Co. v. Blackwell, 84 F.2d 130, (CA 4, 1936); Burkhardt v. Armour & Co., 115 Conn. 249, 161 A. 385, 90 A.L.R. 1260, 1268. The use of the words 'Procter & Gamble's' without identifying which of Procter & Gamble's corporate members is meant to be described supports our view that defendant cannot claim immunity separate from the other members which make up 'Procter & Gamble's.'
 
 
 33
 It was proper for the District Judge to submit the issues of proximate cause and negligence to the jury. The judgment is affirmed.
 
 
 34
 Our affirmance of plaintiff's judgment makes it unnecessary for us to discuss her cross appeal (Case No. 14,512) from the order dismissing the breach of warranty count of her complaint.
 
 
 35
 This case was argued to a panel of the Court consisting of Chief Judge MILLER and Circuit Judges MARTIN and O'SULLIVAN. Judge MARTIN died before a decision was reached or an opinion prepared.