**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Loren Robie WILSON et al., Defendants-
Appellants.**

No. 29955.

United States Court of Appeals,
Fifth Circuit.

Sept. 24, 1971.

Rehearing Denied Oct. 29, 1971.

G. H. Kelsoe, Jr., Dallas, Tex., for Fairman.

Richard E. Harrison, Dallas, Tex., for Hatcher.

Barton E. Bernstein, Dallas, Tex., Court-appointed, for Wilson.

Kerry P. FitzGerald, Dallas, Tex., Court-appointed, for Cooke.

Eldon B. Mahon, U. S. Atty., Charles D. Cabaniss, Andrew Barr, Asst. U. S. Attys., Dallas, Tex., for plaintiff-appellee.

Before GOLDBERG, GODBOLD and RONEY, Circuit Judges.

RONEY, Circuit Judge:

This is an appeal by the defendants, Earl Tanner Fairman, Jr., Harvey Ray Hatcher, Loren Robie Wilson and Charles Stephen Cooke, from convictions involving a conspiracy to counterfeit rare United States coins.[1] Cooke was convicted only of conspiracy. Fairman was also convicted on ten other counts and appeals from these convictions: Five counts of counterfeiting United States coins, four counts of passing counterfeit or altered coins, and one count of altering a United States coin.[2] In addition to the conspiracy count, Hatcher appeals from a conviction for aiding and abetting the attempted passing of counterfeit coins.[3] Wilson was also convicted and appeals from three counts of passing counterfeit coins.[4] Rejecting the numerous specifications of error raised on appeal, we affirm as to all defendants.

The government prosecuted this case on the theory that defendant Fairman made counterfeit coins, that Hatcher was the distributor and that Cooke and Wilson were the salesmen. Although Fairman was also convicted of passing coins, his primary role was that of manufacturer, using specialized equipment which he and Hatcher had purchased.[5]

### I. Restamping of Genuine Coins

Fairman, Hatcher and Wilson argue that the evidence submitted upon certain counts charging the counterfeiting of 1955 dimes in violation of 18 U.S.C. § 485[6] demonstrated that the coins were

---

1. 18 U.S.C. § 371.

2. 18 U.S.C. §§ 331, 485, 490.

3. 18 U.S.C. § 485.

4. 18 U.S.C. § 485.

5. The coins involved were 1939 and 1950 nickels with the mint mark "D", 1931 pennies with an "S" mint mark, 1955 dimes, 1955 double die pennies and 1964

quarters. In addition, Fairman was convicted of altering a 1932 quarter by adding the mint mark "D." All of the genuine issues of the coins counterfeited or altered were of extraordinary value to coin collectors, to whom the sales were made.

6. § 485. Coins or bars
   Whoever falsely makes, forges, or counterfeits any coin or bar in resemblance

not counterfeited but were altered within the meaning of 18 U.S.C. § 331.[7]

This contention is based upon the testimony of the government's expert witness that the coins in question were originally genuine dimes which had been struck with blank dies so that the original coins became planchets, and were then restruck with counterfeit dies to produce the numismatically valuable coins. The defendants assert that because the 1955 dimes were originally genuine coins, no counterfeiting occurred.

■ However, we agree with the government that although a violation of 18 U.S.C. § 331 for mutilating or defacing a coin probably occurred when the coin was made into a blank, at which time it was no longer a coin at all, counterfeiting within the meaning of § 485 took place when the blank was restruck with the counterfeit dies. United States v. Lissner, 12 F. 840 (C.C.Mass.1882); Reg. v. Hermann, 4 Q.B.D. 284. Therefore, the United States could charge the defendants with a violation of either § 331 or § 485, or both, as it saw fit. United States v. Hancock, 441 F.2d 1285 (5th Cir. 1971).

## II. Electronic Eavesdropping

■ Defendants Fairman, Hatcher and Wilson contend that their constitutional rights were violated by the transmission of conversations by electronic equipment concealed on the body of a co-operating informant and by the recording of telephone conversations with the consent of a co-conspirator who was a party to the conversation. These contentions were answered contrary to the defendants' position in United States v. White, 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971). See also United States v. Hernandez, 441 F.2d 157 (5th Cir. 1971); Henley v. United States, 406 F.2d 705 (5th Cir. 1969).

## III. Introduction of Coins

■ Fairman, Hatcher and Wilson attack the acceptance into evidence of numerous coins on the ground that the original recipients of the coins could not positively identify the coins introduced as being the same coins passed to them. However, the government did not introduce the coins through such witnesses but rather traced the chain of custody from each recipient through Secret Service agents and the Director of the Mint and back to the Secret Service agent, who produced the coins at trial. The defendants did not object to the chain of custody. Since the chain of custody was established, there was sufficient foundation for the admission of the coins into evidence. The "chain" is not broken because the original recipients

---

or similitude of any coin of a denomination higher than 5 cents or any gold or silver bar coined or stamped at any mint or assay office of the United States, or in resemblance or similitude of any foreign gold or silver coin current in the United States or in actual use and circulation as money within the United States; or

Whoever passes, utters, publishes, sells, possesses, or brings into the United States any false, forged, or counterfeit coin or bar, knowing the same to be false, forged, or counterfeit, with intent to defraud any body politic or corporate, or any person, or attempts the commission of any offense described in this paragraph—

Shall be fined not more than $5,000 or imprisoned not more than fifteen years, or both. [As amended] * * * July 23, 1965, Pub.L. 89–81, Title II, § 211(a), 79 Stat. 257.

7. § 331. Mutilation, diminution, and falsification of coins

Whoever fraudulently alters, defaces, mutilates, impairs, diminishes, falsifies, scales, or lightens any of the coins coined at the mints of the United States, or any foreign coins which are by law made current or are in actual use or circulation as money within the United States; or

Whoever fraudulently possesses, passes, utters, publishes, or sells, or attempts to pass, utter, publish, or sell, or brings into the United States, any such coin, knowing the same to be altered, defaced, mutilated, impaired, diminished, falsified, scaled, or lightened—

Shall be fined not more than $2,000 or imprisoned not more than five years, or both. [As amended] * * * July 16, 1951, c. 226, § 1, 65 Stat. 121.

can no longer positively identify the coins they turned over to the Secret Service. Forrester v. United States, 210 F.2d 923 (5th Cir. 1954); Gallego v. United States, 276 F.2d 914 (9th Cir. 1960); 1 Conrad, Modern Trial Evidence § 732.5 (1956). Any lack of positive identification affects the weight of the evidence rather than its admissibility and therefore is a matter for the jury. 2 Wharton, Criminal Evidence § 675 (12th Ed. 1955).

## IV. Testimony of Use of Counterfeiting Equipment

■ Defendants Fairman and Wilson object to testimony of an expert witness as to how certain equipment which was in evidence could have been used in a counterfeiting operation on the ground that such testimony was a matter of conjecture. The witness, who was the Technical Consultant to the Director of the United States Mint, clearly was an expert and his testimony certainly could have aided the jury in understanding the exhibits. He described in positive terms how the equipment could be used in a counterfeiting operation. The expert went no farther and did not speculate on whether the exhibits had been used in counterfeiting or whether the defendant Fairman had so used them. The words "could" or "might" as used in this context do not necessarily render the opinion speculative. See, e. g., Friedman v. General Motors Corp., 411 F.2d 533 (3rd Cir. 1969); Leckbee v. Continental Airlines, Inc., 410 F.2d 1191 (5th Cir. 1969); United States v. Lombardozzi, 335 F.2d 414 (2d Cir. 1964), cert. den. 379 U.S. 914, 85 S.Ct. 261, 13 L.Ed.2d 185 (1964); Bathory v. Procter & Gamble Distributing Co., 306 F.2d 22 (6th Cir. 1962). That one use of the equipment was for counterfeiting was a circumstance that the jury could consider in reaching its verdict, along with defendant's testimony that the equipment was used for legitimate purposes.

## V. Restricted Cross-Examination

■ Fairman and Wilson contend that the district court committed reversible error when it refused to permit Fairman's attorney to cross-examine a coin collector witness as to the refusal of the witness to meet with the attorney and Fairman shortly before trial so that the witness could see Fairman for identification purposes. The witness did not identify Fairman or mention his name during his testimony. Thus there is a serious question as to whether the question was relevant at all. However, even if there were any error in not permitting the question to be asked, it was cured when the entire testimony of the witness was later stricken and the jury instructed to disregard it. Defendant's argument that prejudice remained is without support since the testimony of the witness before the jury was less than four pages out of a transcript totalling 1927 pages.

## VI. Further Tests of Alteration

■ Fairman asks for reconsideration of his request that an additional test be made on the coin involved in Counts 8 and 9. Fairman was convicted of altering and passing a 1932 quarter. The government contended that Fairman had added a mint mark "D" to the coin to make it more valuable numismatically. Fairman argued that the coin was a genuine 1932 D quarter.

The government produced evidence that Fairman had told a co-conspirator that he had altered coins by taking the mint mark from one coin and transferring it to another. It introduced a photograph purporting to show a crack between the "D" and the coin. Further the government's expert testified that based upon his study of the coin, in his opinion, the mint mark had been added.

The defendant produced an expert, who testified, with the aid of photographs, that in his opinion the coin was genuine. This witness from a New York City firm was of Fairman's choice and was able to command $1,000 per day for his testimony.

Fairman also conducted a courtroom experiment on the 1932 quarter in front of the jury. There was testimony that the "D" could be added by glue, solder, or by driving a spike on the back of the "D" into a hole drilled in the quarter. Defendant's expert testified that if the coin were heated, the mint mark would come off. However, the government's expert stated that such a test was not necessarily conclusive. With the aid of a torch Fairman heated the coin red hot. The experiment was not completed because, as described in the government's brief, "as the coin was heated, it became hotter and hotter until it turned into a glowing slug of molten metal which melted in two and fell to the floor in front of the jury box. After the experiment, the coin was recognizable as a quarter. However, its details were not clear; it was charred and crusty, and it was in two pieces, the larger of which was slightly warped." [8]

After the case was on appeal, Fairman filed a motion in this court for examination of the quarter. The test requested was described as having the coin cross-sectioned at the mint mark and then "subjected to electron microprobe analysis with secondary electron images scanning the microscopic pictures to show any fissures or cracks." The government objected on the grounds that the issue was fully litigated at trial, that the defendant hired his own expert and devised his own defense tactics, and that the coin had been destroyed beyond usefulness in that the mint mark had been fused to the coin.

Another panel of this Court denied the motion prior to the preparation of briefs and oral argument in the main appeal. Nothing new has been presented in the briefs or at oral argument so as to require a different result.

VII.   Improper Search Warrant

■   Fairman objects to the use of evidence which was seized pursuant to a search warrant on the ground that the property seized was not described in the warrant. However, the warrant authorized seizure of "paraphernalia for making coins" among other things. All of the evidence objected to was described by government witnesses as capable of being used for making coins. Under such circumstances, the description was sufficient.

■ ■   The defendant's contention that the warrants were served at night contrary to Rule 41(c), F.R.Cr.P., is defeated by the district court's taking judicial notice that 7:30 P.M. in July (when the warrant was served) is daytime in Dallas during Daylight Saving Time. No evidence was offered to the contrary. See McAffee v. United States, 72 App. D.C. 60, 111 F.2d 199 (1940), cert. den., 310 U.S. 643, 60 S.Ct. 1094, 84 L.Ed. 1410 (1940).

■   Defendant also objects to the evidence because there was a failure to return and file the warrant. Any such defect is ministerial and does not affect the validity of the search. United States v. Haskins, 345 F.2d 111 (6th Cir. 1965); Reisgo v. United States, 285 F. 740 (5th Cir. 1923).

VIII.   Illegal Search of Hatcher

■ ■   Hatcher was arrested with a warrant and subjected to a search. The search produced names of two individuals, who subsequently testified for the prosecution. The government concedes the arrest warrant was invalid but contends that probable cause existed for

---

8. The record states:

"(At this point a demonstration was performed heating the coin referred to.)

"MR. KELSOE: [attorney for Fairman] May the record reflect, Your Honor, that we have now heated Government Exhibit No. 22 and it is red hot, in fact, it is melted in two.

Your Honor, we can clean this up with a little water.

THE COURT: I hope you are satisfied with that demonstration.

MR. KELSOE: No ma'am, I am not. I was disappointed in it, Your Honor.

THE COURT: You smell the carpet burning too, don't you?"

the arrest.[9] Hatcher does not contest the question of probable cause, nor could he, in view of the strong evidence that the government had at the time of arrest. Rather it is his position that if the arrest warrant is invalid, the search incident to arrest is invalid. However, notwithstanding the invalidity of the search warrant, the arrest was valid since it was supported by probable cause. Hagans v. United States, 315 F.2d 67 (5th Cir. 1963), cert. den. 375 U.S. 826, 84 S.Ct. 68, 11 L.Ed.2d 58 (1963); United States v. Hall, 348 F.2d 837 (2d Cir. 1965), cert. den. 382 U.S. 947, 86 S.Ct. 408, 15 L.Ed.2d 355; Ray v. United States, 412 F.2d 1052 (9th Cir. 1969). A search incident to an arrest valid on one ground is not an illegal search merely because the arrest would be invalid if supported only by the faulty warrant.

### IX. Severance

■ Each defendant contends that the district court erred when it denied each defendant's motion to sever. The test on review of a denial of a motion to sever is whether the trial court abused the rather broad discretion allowed in the conduct of the trial.

■ Basically, it is each defendant's position that he was prejudiced by the fact of multiple counts and multiple defendants and that the evidence tended to cumulate against each. This alone does not reach the affirmative prejudice which must be clearly shown to demonstrate an abuse of discretion by the trial court. Tillman v. United States, 406 F. 2d 930 (5th Cir. 1969), cert. den. in part, vacated and remanded in part on other grounds, 395 U.S. 830, 89 S.Ct. 2143, 23 L.Ed.2d 742 (1969).

■ Fairman, who was the only defendant to testify, specifically complains of the denial of severance because he was prevented from commenting on the failure of his co-defendants to testify,

citing De Luna v. United States, 308 F. 2d 140 (5th Cir. 1962). Fairman proffered the argument that "he had the guts to take the stand and testify," whereas the others had remained mute and that their silence should not be held against him. In response to counsel's request for permission to so comment, the district court stated:

> " * * * I instructed you not to argue that, that there was no antagonism with reference to the defense of each of the Defendants. The Defendants had all consulted together during the trial, their lawyers had consulted together; the Motions in many instances were made by all of the Defendants; the objections were made by all of the Defendants in practically all matters, and there is no reason for you to comment on this fact that the defendant did not testify."

In Gurleski v. United States, 405 F.2d 253 (5th Cir. 1968), cert. den. sub nom. Smith v. United States, 395 U.S. 977, 89 S.Ct. 2127, 23 L.Ed.2d 765 (1969), reh. den., 396 U.S. 869, 90 S.Ct. 37, 24 L.Ed. 2d 124 (1969), it was said:

> "The *De Luna* rule applies only when it is counsel's *duty* to make a comment, and a mere desire to do so will not support an incursion on a defendant's carefully protected right to silence. Clearly a duty arises only when the arguments of the co-defendants are antagonistic." 405 F.2d 265. (Emphasis in original).

Since antagonistic defenses were not present in this case, *De Luna* has no application.

### X. Sufficiency of the Evidence

#### a. Fairman

■ Fairman attacks the sufficiency of the evidence to support his conviction on four of the eleven counts upon which he was convicted.[10] The counts chal-

---

9. The warrant charged a violation of 18 U.S.C. §§ 472, 473, relating to counterfeit bills rather than counterfeit coins.

10. Fairman also attacks his conviction for passing the 1932 quarter referred to in Section VI above (Count 9). We have

lenged are concurrent with counts which have not been questioned or which have been upheld.[11] Therefore, we need not consider the evidence on such concurrent counts. United States v. Easterly, 5th Cir. 1971, 444 F.2d 1236.

### b. Cooke

■ Cooke's conviction for conspiracy was based upon sales of counterfeit 1950 D and 1939 D nickels in the Kansas City area. The defendant challenges the sufficiency of the conviction in two respects: (1) whether the coins Cooke sold were counterfeit; and (2) whether he willfully and knowingly became a member of the conspiracy. On such arguments, the evidence is considered in the light most favorable to the government. Glasser v. United States, 315 U. S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942).

■ There was testimony that Cooke sold a large number of 1950 D nickels to Gregor's, Inc., a coin and stamp store in Kansas City. The general manager of Gregor's testified that of the coins turned over to the Secret Service, "I bought a lot of them from Charlie Cooke." While coins purchased from another (an individual who dealt with Cooke) were also turned over to the Secret Service, all of the 1950 D coins received from Gregor's were counterfeit in the opinion of the government's expert.

In addition, Jack Klausen, a coin dealer, testified that Cooke offered to sell Klausen some 1950 D nickels, which Klausen examined. In Klausen's opinion the coins were counterfeit.

Based upon the foregoing evidence, the jury could find that Cooke was selling counterfeit coins.

However, the question of whether Cooke willfully and knowingly joined the conspiracy is more difficult.[12] In essence, as Cooke argues, this issue becomes whether there was sufficient evidence to permit the jury to find that Cooke knew the coins were counterfeit. We hold that there was.

■ Certain guidelines have been developed to weigh the sufficiency of evidence in cases involving the passing of counterfeit bills. Ruiz v. United States, 374 F.2d 619 (5th Cir. 1967); Paz v. United States, 387 F.2d 428 (5th Cir. 1967); United States v. Alea, 433 F.2d 948 (5th Cir. 1970). As pointed out in those cases there is no presumption of guilty knowledge from the fact that the coins were proved to be counterfeit subsequent to their being passed. However, since guilty knowledge can usually only be proved by circumstantial evidence, the jury may examine the entire conduct of defendant at the times in question.

Cooke was selling "rare" nickels on a large volume basis. The general manager of Gregor's testified that $27,000 was paid to Cooke for 1950 D nickels. Cooke sold 1950 D nickels to Gregor's a minimum of four times, with each transaction involving ten to twenty rolls. Jack Klausen testified that Cooke offered to sell him 1950 D nickels at $450 per roll, which was $50 below the market price. Klausen told Cooke he did not want to buy any because he thought they were "phony" because of the bad color of the coins. Cooke explained to Klausen the color was due to the fact that the coins had gone through the 1951 Kansas City flood which had caused chemicals to discolor the coins. Cooke also offered to sell 1950 D nickels to two other Kansas

already rejected his request for further testing. The testimony of the government's expert along with the other evidence was sufficient to permit the jury to find that the coin was altered. The conviction on that count is affirmed.

11. Defendant attacks Counts 3, 4, 8 and 10. Count 3 is concurrent with Count 13; Count 4 is concurrent with Count 11; Count 8 is concurrent with Count 1;

and Count 10 is concurrent with Count 9, which we have found sufficient.

12. The jury could have connected Cooke with the conspiracy by evidence that Hatcher had shipped goods to Cooke, and by testimony of a co-conspirator that he had been in Wilson's apartment with Wilson and Cooke when four 1950 D nickels were displayed, which Cooke said were worth $800 per roll.

City coin dealers.[13] One of the dealers thought the coins were counterfeit and the other believed the coins were "not genuine." [14] However, neither dealer told Cooke of his opinions.

In addition, Cooke apparently desired to deal in cash. Cooke sold 1950 D nickels to one dealer and due to Cooke's request, received the $1200 payment in cash. The wife of a deceased coin dealer who dealt with Cooke saw her husband pay cash to Cooke for coins. Similarly, the son of the same coin dealer delivered $7000 in cash to Cooke. In dealing with Klausen, Cooke also was insistent upon cash. From Gregor's Cooke received checks on four different occasions which were cashed immediately by having a Gregor's employee accompany Cooke to the bank. It could be of consequence that the checks from Gregor's were made out in the names of "Kuch" and "Koch".

In view of the large volume of "rare" coins; the discount price; the communicated opinion of at least one dealer that the coins were phony; the explanation by Cooke for the coins' unusual color; the fact that other dealers thought the coins were not genuine; the insistence upon cash; and the incorrect names on the checks, we believe that the jury could infer that Cooke knew the coins were counterfeit. United States v. Sheiner, 410 F.2d 337 (2d Cir. 1969), cert. den., 396 U.S. 825, 90 S.Ct. 68, 24 L.Ed.2d 76 (1969).

### c. Wilson

■ Wilson challenges the sufficiency of the evidence to sustain his convictions of conspiracy, of selling counterfeit 1955 dimes to Oscar Utay, of selling counterfeit 1955 dimes to Jack Whitehurst, and of attempting to sell counterfeit dimes to Whitehurst. In September, 1967, Wilson went to a pawn shop operated by Oscar Utay and attempted to sell Utay some 1955 dimes. Utay then sent Wilson to Whitehurst, a Dallas coin dealer whom Utay considered more of an expert than himself. Wilson exhibited eight rolls of dimes and Whitehurst examined them and told Wilson they "looked all right." While Wilson was returning to Utay's shop, Whitehurst called Utay and suggested Utay buy a roll because the coins were questionable. Utay bought one roll which was turned over to Secret Service. Wilson returned to Whitehurst's store and offered Whitehurst some of the coins. Not knowing if Utay had purchased any, Whitehurst purchased one roll. This roll also was given to the Secret Service. Both rolls were counterfeit.

Within a week, Wilson returned to Whitehurst's store and offered to sell him some more of the 1955 dimes. Although Whitehurst purchased no coins, he delayed Wilson and called the Secret Service. Two agents followed Wilson when he left the store. After walking up the street, around the corner and down the block, Wilson got in a car driven by Hatcher. The agents lost the car while they were obtaining their vehicle. They went to Hatcher's apartment and saw the same car parked there. Shortly thereafter Hatcher and Wilson emerged and as they approached the car, a Secret Service agent drove by. "They both watched the car and strained and leaned around and watched it until the [agent's] car was completely out of view."

There was also testimony that Cooke and Wilson were present at Wilson's house in Kansas City where 1939 nickels were exhibited; that Wilson, in response to the question of "what's going on" asked by an individual who was later

13. Although one of the dealers could not positively identify Cooke, from all of the other circumstances in this case, the jury could have found that the offeror was, in fact, Cooke.

14. This dealer's testimony is somewhat equivocal in that although he testified that he thought the 1950 D nickels were not genuine it appears that he may not have been stating that the coins were counterfeit, but only that the coins were an unusual color and did not have the normal luster of a "brilliant, uncirculated" coin. However, they also did not appear to have been circulated because there was no sign of wear.

to join the conspiracy and then testify for the government, exhibited about ten rolls of nickels and replied that it was his expense money; that at the same time Wilson had a handful of money; that Wilson, like Cooke, received an air freight package from Hatcher; and that on one occasion Hatcher was looking for Wilson because Wilson owed him $5,000. In addition, when Wilson sold coins to Whitehurst he gave a receipt listing his address as 4534 Cedar Springs. An investigation by the Secret Service revealed that there was no such address and no one in the area had heard of Wilson.

Since the 1955 dimes were counterfeit, the only question is whether Wilson knew they were counterfeit. We think the jury could fairly find guilty knowledge from the number of rolls of valuable coins offered for sale, the unusual concern with the appearance of a Secret Service agent, the distance Hatcher parked from the store, and the false address given to Whitehurst, especially when colored by the other testimony mentioned.

#### d. Hatcher

██ Hatcher also contests the sufficiency of the evidence to sustain his convictions. As to the conspiracy count, the evidence is strong and clear. Fairman and Hatcher acted together in obtaining machinery and in seeking blanks which could be used in counterfeiting. In addition to the testimony already mentioned connecting Hatcher with Cooke and Wilson, Hatcher traveled with a co-conspirator named Byron Hazel across Illinois, Indiana, Ohio and Kentucky selling coins. Later, Hatcher supplied Hazel and Jerry Pierce, another conspirator, with coins to sell across the Gulf Coast and up the Atlantic Coast. Upon the arrest of Hazel and Pierce the

coins supplied by Hatcher were determined to be counterfeit.

██ Although the conspiracy count is clearly supported by strong evidence, we must examine Hatcher's conviction for aiding and abetting Wilson in attempting to sell counterfeit dimes to Whitehurst since the sentence on that count is greater than on the conspiracy count. The only connection between Hatcher and the substantive offense was that Hatcher was waiting for Wilson upon the latter's departure from the attempted sale. This obviously would be a slim basis for a conviction without more. Here, however, there was much more from which the jury could find that Hatcher had aided and abetted Wilson. Testimony of other violations committed by Hatcher is admissible to characterize what could be an innocent act and to demonstrate criminal intent and guilty knowledge. Weiss v. United States, 122 F.2d 675 (5th Cir. 1941), cert. den. 314 U.S. 687, 62 S.Ct. 300, 86 L.Ed. 550 (1941). Hatcher had procured at least two individuals, Hazel and Pierce, to pass counterfeit coins to coin stores. Further, on the occasion where Hatcher accompanied Hazel through Illinois, Indiana, Ohio and Kentucky, the procedure was that upon arrival in a town, the pair would check the telephone book to locate the coin shops. They would drive to the shop and Hatcher would wait in the car while Hazel went into the store to sell the coins. Hatcher would receive $100 per sale and Hazel would keep anything over that amount. Based upon this evidence the jury was justified in finding that Hatcher was not engaged in an innocent act when he drove Wilson to Whitehurst's coin store but was criminally aiding and abetting the attempted passing of counterfeit coins.

Affirmed.