## 39587. GILSTRAP v. THE STATE.

GREGORY, Justice.

Eugene Gilstrap, Jr. was convicted of the aggravated assault of Cora Sharp and the murder of Luther Zinamon. The defendant was sentenced to ten years for the aggravated assault to run consecutively to the sentence of life imprisonment imposed for the conviction of murder.

At trial Cora Sharp testified that at approximately 9:00 p. m. on November 7, 1981 she was travelling down Johnson Road in Fulton County when she heard a noise sounding like "a shot" or a "tire blowing out." Looking in her rearview mirror she saw that a taxicab had crashed into a utility pole. As Sharp backed her car toward the taxicab, she observed a man disembark from the cab and approach her car. Sharp testified that she stopped her car "about six feet" from

the cab. The man approached her car and, from a distance of four feet, shot into her car, stating "I don't need no damn witnesses." Both the driver's and passenger's side windows were shattered. Sharp then observed her assailant "running back towards the cab." The witness testified that she was able to get a close look at her assailant because he was standing under a street light when he fired at her.

Sharp drove to a neighboring house to call police, and, within minutes, returned to the scene with a patrolman. She described her assailant to the patrolman as "tall with a moustache and beard." After discovering that the cab driver was dead, the patrolman asked Sharp to ride around the neighborhood with him to see if Sharp could recognize her assailant. Sharp agreed. As the patrolman began to drive away from the scene he noticed a car stopped behind him. As he pulled to one side of the street to allow the car to pass, Sharp identified the defendant, the driver of the car, as her assailant. The patrolman immediately apprehended the defendant and placed him under arrest. Sharp testified that while she had not "known" the defendant, she had seen him "once or twice" previously at the Perry Homes complex. Other evidence at trial indicated that Sharp and the defendant had attended Archer High School at the same time.

At the time of arrest the defendant had over $1300 on his person. The investigating officer testified that the defendant told him he had won this sum gambling.

The parties stipulated that Luther Zinamon, the driver of the taxicab, died from a gunshot wound to the head.

Several witnesses testified that the defendant had been in their presence from 7:30 p. m. on November 7 until his arrest by police. Each of these witnesses testified that they had gathered at a place known as Farley's Garage to repair cars and gamble throughout the day of the murder; that the defendant initially arrived at Farley's Garage at 3:00 p. m. that day, but left and returned again around 7:30 p. m.; that just before 9:00 p. m. some of the men left Farley's Garage to go to a liquor store before it closed; that shortly after 9:00 p. m. the remaining men, including the defendant, left, travelling caravan-style in four automobiles down Johnson Road toward the home of one member of their group. There was testimony indicating that when the police detained the defendant at the murder scene, two or three of the defendant's friends stopped and informed the police that the defendant had been with them for the last two hours. The police dispersed this group without taking any statements. One of the remaining members of the defendant's group testified that he drove past the police blockade without stopping for fear of being arrested for driving under the influence of alcohol. These witnesses later contacted the defendant's attorney and offered to testify in his

behalf.

Wynn Hawkins, the manager of the taxicab company which had employed the murder victim testified that the victim worked full time for the company as a mechanic and only drove a cab a few nights each week to earn additional money. Hawkins testified that "on a good night" the victim would take in between $70 and $100 in fares. Hawkins stated that the victim had a policy of carrying no more than five dollars in change on his person when he drove the cab; as his fares increased he would drive to his home and deposit sums of cash greater than five dollars there. Hawkins expressed his opinion that it was "not likely" the victim would have taken in "as much as $1800" [sic] on the night of his death.

(1) Defendant argues that Cora Sharp's "show-up identification" of him as her assailant at the crime scene was so suggestive and susceptible to the danger of mistaken identification as to violate due process. We note that the fact that Cora Sharp identified the defendant while in the presence of a police officer does not, without more, bring this identification procedure within those due process considerations which attend line-ups and "show-ups" staged by law enforcement officers. In cases involving the latter, an accused, already under suspicion by the state, is confronted by his accuser under conditions controlled by the state. In these circumstances the potential for improper and prejudicial influence by the state exists, and standards of due process require that the identification procedures not be impermissibly suggestive. United States v. Wade, 388 U. S. 218 (87 SC 1926, 18 LE2d 1149) (1967); Stovall v. Denno, 388 U. S. 293 (87 SC 1967, 18 LE2d 1199) (1967). In this case, however, the identification of the defendant was spontaneously made by Cora Sharp at a time when the defendant was not under police suspicion for the commission of any crime. The identification in this case was not prompted by state action which would bring the factors involved in Wade and Stovall, supra, into play.

Nor did the chance identification of the defendant by Sharp violate his Sixth Amendment right to counsel. This constitutional guarantee is not applicable to an identification procedure which is part of a "routine police investigation" and is not a "critical stage of the *prosecution.*" Kirby v. Illinois, 406 U. S. 682, 690 (92 SC 1877, 32 LE2d 411) (1972).

(2) The defendant next maintains that the trial court erred in refusing to allow him to impeach the testimony of Cora Sharp with the record of her conviction for aggravated assault. We agree and reverse.

It is not disputed that in 1970 Cora Sharp was sentenced to three

years on probation for aggravated assault under the Georgia First Offender Act, OCGA § 42-8-60 et seq. (formerly Code Ann. § 27-2727 et seq.). At the defendant's trial the State successfully argued that because Sharp had fulfilled the terms of her probation she was "not . . . considered to have a criminal conviction" OCGA § 42-8-62 (formerly Code Ann. § 27-2728) and, therefore, the rule regarding impeachment of a witness by prior conviction was inapplicable. However, we held in *Favors v. State,* 234 Ga. 80, 87 (214 SE2d 645) (1975) that "[i]n balancing the rights of a first offender to be protected against having the stigma of a criminal record as opposed to the rights of a defendant in a criminal case to impeach the testimony of the witnesses against him, the latter prevails." Therefore, the court below erred in refusing to allow the defendant to impeach Cora Sharp with Sharp's First Offender record.

We cannot accept the State's argument that this error was harmless. The State's case against the defendant rested entirely on the identification testimony of Cora Sharp. The defendant was entitled to impeach this testimony with the record of Sharp's previous felony conviction.

(3) We have examined defendant's remaining enumerations of error and find them either without merit or unlikely to recur on re-trial.

*Judgment reversed. All the Justices concur.*

Decided April 5, 1983.

*Franklin, Axam & Ashburne, Tony L. Axam,* for appellant.
*Lewis R. Slaton, District Attorney, Benjamin H. Oehlert III, Assistant District Attorney, Michael J. Bowers, Attorney General, Nicholas G. Dumich, Assistant Attorney General,* for appellee.