E.J. WILSON, et al., Dearest Davis, et al., and Cassandra Linder, Plaintiffs-Appellants,

v.

Roland ATTAWAY, et al., Defendants-Appellees.

No. 83–8237.

United States Court of Appeals, Eleventh Circuit.

April 16, 1985.

Brian Spears, Ralph Goldberg, Atlanta, Ga., John Carroll, Montgomery, Ala., Floyd Mincey, Dublin, Ga., for plaintiffs-appellants.

W.W. Larsen, Dublin, Ga., for defendants-appellees.

Before GODBOLD, Chief Judge, CLARK, Circuit Judge, and THOMAS *, District Judge.

* Honorable Daniel H. Thomas, U.S. District Judge for the Southern District of Alabama, sitting by designation.

GODBOLD, Chief Judge:

This is an appeal in three consolidated civil rights cases arising from events that occurred in Wrightsville, Johnson County, Georgia, in April and May 1980.

Several plaintiffs claimed that they were unconstitutionally arrested. All plaintiffs except Richard Turner claimed that they were exposed to unconstitutional conditions in the county jail. All plaintiffs are black, all defendants white. A jury returned verdicts for defendants on all issues.

Some plaintiffs contend they were entitled to summary judgment on the unconstitutional arrest issue. All except Turner contend they were entitled in judgment n.o.v. on the same issue. Numerous other points are raised concerning evidentiary rulings and other incidents at trial, many of which were not objected to when they occurred. We affirm in part and reverse in part.

## I. Background

### A. Facts

On April 5, 1980 a march commemorating Dr. Martin Luther King was conducted through several small towns in east central Georgia including Wrightsville. A parade route through Wrightsville had been approved on the request of the marchers. When they reached Wrightsville they deviated from the approved route and stopped in a parking lot in front of the courthouse. John Martin, one of the plaintiffs, testified that as the marchers left he requested Chief of Police Smith to help direct traffic but that Smith, the only policeman on duty, refused. Martin later claimed that Smith struck or pushed him and threatened him. Smith's testimony did not indicate that such an incident occurred. At least one witness testified that there "was a gesture of refusal and [Smith] walked away." T. 544. Martin obtained from a justice of the peace a warrant charging Smith with assault and battery.

On April 7, after Deputy Sheriff Tanner declined to serve the warrant on Smith, Martin and Rev. E.J. Wilson, a Wrightsville minister, went to the Johnson County sher-iff's office in order, Martin testified, to present the warrant to Sheriff Roland Attaway. Attaway testified that he explained to Martin that a warrant against Smith would have to be issued by a judge rather than a justice of the peace. Attaway testified further that the office was in the middle of an accident investigation, that Martin and Wilson obstructed the investigation, and that Martin refused to leave when requested. Attaway swore out arrest warrants against Martin and Wilson for obstructing an officer and jailed Martin for a few minutes to end Martin's obstruction of the investigation.

These events led to protest rallies by blacks on the evenings of April 7 and 8 in front of the sheriff's office on the courthouse square. At the April 8 demonstration a crowd of whites assembled and violence broke out. Witnesses for the plaintiffs testified that the whites attacked the blacks and that county deputies and Wrightsville City police participated in the attack. Attaway and other defendants denied this. Following this altercation, Attaway swore out warrants for the arrest of several black demonstrators.

Between April 8 and May 19 other demonstrations occurred. They escalated in intensity, drawing more people and more diverse groups, including the Southern Christian Leadership Conference; the United Front, a group described as not committed to non-violence; a leader of the Klu Klux Klan and other Klansmen; J.B. Stoner, presently in Alabama prison for a 1980 bombing conviction; and the Revolutionary Communist Party.

Violence began again on May 19. In the late afternoon Wilson and others began driving around the courthouse square. Attaway told a deputy to arrest Wilson on the April 7 warrant and the deputy did so. Later Officer Garnto, the only on-duty officer of the Wrightsville City Police, drove his patrol car down South Valley Street, in the black-populated section of town. Garnto testified that as he approached Wilson's church he observed a crowd of blacks including Martin. He testified that Martin

said "we'll get you tonight," whereupon an approving shout went up from the crowd.

Garnto picked up another Wrightsville officer who was coming on duty. Later, when he and the officer were speaking with state troopers in a Georgia State Patrol car, they heard shots and a gas explosion and saw a building on fire on South Valley Street. Both cars proceeded down South Valley Street. The State Patrol car was shot at in the vicinity of the burning building. It sped on down the street toward Wilson's church, about a block away. The city patrol car was fired upon. Five shots went through the windshield and Garnto was struck twice by bullets. He observed gunfire coming from the area of the Clover house, which is across the street from the burning building, and from in front of and around Wilson's church. He testified that at least a hundred shots were fired. He drove to the sheriff's office and reported these events to Attaway. He was then sent to the hospital in Dublin, a town about 20 miles away, accompanied by the other Wrightsville officer.

Meanwhile Martin had called the Georgia State Patrol office in Dublin and talked with Sgt. Henry Smith. Smith testified that Martin told him that the people in the community were upset, that he would be unable to control them any longer, and that Smith should meet him at the church to see for himself. Smith arrived with Sgt. Denny in an unmarked patrol car. He went and talked with Martin in front of the church among a crowd of 60 or 70 blacks "milling around . . . in an uneasy manner."

He soon thereafter saw flames leaping up high without any noise except like the noise when one ignites gasoline. Gunshots then "rang out up and down the street, everywhere." From across the street automatic rifle fire struck the wall of the church above Smith's head. Smith heard 60 to 70 shots up and down the street. He crawled to his car and heard a police radio transmission, "I've been hit, I've been hit, I need help." Denny called from the patrol car and said "let's get the hell out of here before we get shot." When another State Patrol car arrived, Denny ordered it out of the area. Denny and Smith left the area. When they examined the other Patrol car they found bullet holes in it. Gunfire in the black section of town continued. Denny ordered the other Patrol car to go and wait behind the high school until it was joined by the Patrol's "riot squad." Smith went to Dublin to call his supervisor.

Meanwhile the Wrightsville Fire Department answered the fire alarm for the burning building. The city fire truck was damaged by gunfire, as well as the automobile of a volunteer fireman, as they arrived at the fire; the vehicles were driven away by the gunfire. While these events were occurring on South Valley Street, a woman was shot in the street and other women were calling the sheriff's office in alarm.

Sheriff Attaway heard hundreds of gunshots. Attaway went to South Valley Street where he arrested some 40 black people, including plaintiffs. Attaway testified that the persons arrested were turned over to the Georgia Bureau of Investigation for processing, interviewing, and booking.

The Georgia State Patrol riot squad arrived. Fred Taylor, a black leader from Atlanta, arrived and was assaulted by a crowd of whites near the courthouse. A state trooper ran to call the riot squad, and a deputy sheriff fought off the assailants and rescued Taylor.

### B. The cases below

These events led to four civil suits. In *Wilson v. Attaway,* CV 380–24, Wilson, Martin, and Richard Turner filed a class action charging Attaway, two Johnson County deputy sheriffs, the City of Wrightsville, Chief of Police Smith, and three Wrightsville police officers with wrongfully beating them and breaking up the courthouse square rally of April 8 in violation of 42 U.S.C. §§ 1981, 1983, 1985, and 1986.

In *Davis v. Attaway,* CV 380–65, Dearest Davis and nine other plaintiffs charged the *Wilson* defendants, plus Johnson County, members of the Wrightsville City Council,

the Commissioners of Roads and Revenue of Johnson County, and Georgia Bureau of Investigation Agent Morman with violations under 42 U.S.C. §§ 1981, 1983, 1985(3), 1986 and 1988 and under state law. Plaintiffs also sought to have § 20 of the Wrightsville City Charter, authorizing warrantless arrests of any person within city limits guilty of violating any city ordinance, declared unconstitutional.

*Linder v. Attaway,* CV 382–27, tracks the complaint in the *Davis* case.

Martin and Wilson filed a separate suit to enjoin criminal proceedings against them and 12 others.

These four cases were consolidated before trial. A state judge found that the state criminal charges, alleging an assault on Garnto, were not supported by probable cause and were dismissed. The Martin-Wilson suit was then dismissed. In the remaining three consolidated cases the district court entered judgments for defendants based on jury verdicts and denied motions for judgments n.o.v. and for new trials.

## II. The motion for partial summary judgment

Plaintiffs alleged in the *Davis* case that they were arrested without probable cause. Appellants Horton, Rouse and Snell moved for partial summary judgment in the *Davis* case, seeking to establish Attaway's liability for their allegedly unlawful arrests on the evening of May 19. 6 Rec. 382–83. The court denied the motion, finding, in part, a genuine issue as to whether Horton, Rouse and Snell obstructed law enforcement officers. 6 Rec. 530–31, 539–43. This was not error.[1]

■ Cases construing the Fourth Amendment reflect the ancient common law rule that a peace officer may make a warrantless arrest "for a misdemeanor or felony committed in his presence as well as for a felony not committed in his presence if there was reasonable ground for making the arrest." *U.S. v. Watson,* 423 U.S. 411, 418, 96 S.Ct. 820, 825, 46 L.Ed.2d 598 (1976); *see also,* O.C.G.A., § 17–4–20 (1982). There must be probable cause to believe the person arrested committed the offense. *Jarrell v. Balkcom,* 735 F.2d 1242, 1249 (11th Cir.1984); *U.S. v. Mastrangelo,* 733 F.2d 793, 799 (11th Cir.1984).

■ Probable cause to arrest exists where "the facts and circumstances within the collective knowledge of the law enforcement officials, of which they had reasonably trustworthy information, are sufficient to cause a person of reasonable caution to believe that an offense has been or is being committed." *U.S. v. Pantoja-Soto,* 739 F.2d 1520, 1523 (11th Cir.1984).

■ Probable cause must be judged not with clinical detachment but with a common sense view to the realities of normal life. *U.S. v. Herzbrun,* 723 F.2d 773, 775 (11th Cir.1984).

At the time of the May 19, 1980 arrests O.C.G.A. § 26–2505, (now codified as O.C.G.A. § 16–10–24 (1984)) provided:

> A person who knowingly and willfully obstructs or hinders any law enforcement officer in the lawful discharge of his official duties is guilty of a misdemeanor.

Attaway's affidavit in opposition to summary judgment stated that he ordered people to get off the streets and arrested those who willfully and knowingly refused to obey this lawful order and obstructed the purpose of trying to restore peace.

The answers of Attaway and Emory Rowland to plaintiffs' second set of interrogatories were also before the court.

1. We consider this point on the merits. We eschew entering in this case the morass of when, if at all, the denial of a motion for summary judgment, though unappealable when interlocutory, is appealable following final judgment. There is authority that in such appeal the denial may be reviewed, 10 C. Wright, A. Miller, & M. Kane, Federal Practice & Procedure § 2715 n. 25 (1983), and other authority that it may not be reviewed. Annot., 17 L.Ed.2d 886, 893–94 (1967). This circuit has reviewed a denial of a motion for summary judgment for an abuse of discretion, *Johnson v. Bryant,* 671 F.2d 1276, 1279 (11th Cir.1982), as has its predecessor. *National Screen Service Corp. v. Poster Exchange, Inc.,* 305 F.2d 647, 651 (5th Cir.1962).

**1236**

They state that Joe Louis Barkley, who Attaway found near the Clover house on the night of May 19, refused to obey an order to leave the area and therefore was arrested for obstructing the efforts of the officers to restore order, and that "other persons listed on page 48 of the jail records above the name of Reber Boult were arrested in the same circumstances as ... Barkley." 6 Rec. 487–89. On page 48 of the Johnson County jail record, which was submitted to the court, the names of Horton, Snell and Rouse appear above Boult's name. 6 Rec. 386.

The district court applied *Samples v. State*, 151 Ga.App. 179, 259 S.E.2d 178 (1979), and held that the summary judgment materials raised an issue whether plaintiffs displayed some "forcible resistance or opposition to the officer[s] in the performance of [their] duties." [2]

■ Given Attaway's uncontradicted statement that he ordered the streets cleared and the evidence that Horton, Rouse and Snell were among those who refused to obey an order to leave the area and were arrested for obstructing the efforts of the officers to restore order, the district court did not err in its conclusion that a jury issue was presented whether their conduct hindered or impeded Attaway in the lawful discharge of his official duties. *Hudson v. State*, 135 Ga.App. 739, 218 S.E.2d 905, 907 (1975).

■ Even if a jury issue otherwise existed as to the validity of the arrests of Rouse, Snell and Horton we must consider whether booking for "investigation" rendered the arrests invalid as a matter of law. In *Barnett v. U.S.*, 384 F.2d 848 (5th Cir.1967), the defendants were arrested for the specific purpose of extradition and were so informed shortly after their arrests but were charged with "defrauding," which did not constitute a crime under state law. The Fifth Circuit held that where "a valid basis for arrest and detention exists, is relied upon by the investigating officers and is communicated to the arrestees, the use by the jailer of an imprecise term to describe the basis for detention will not invalidate that detention." *Id.* at 856.

These plaintiffs were booked for "investigation" and, so far as the record shows, were not informed of why they were arrested. But the material before the court on motion for summary judgment indicating that a trial on the merits might reveal a valid basis for the arrest, that the offense justifying the arrest had been committed in the presence of the arresting officers immediately before the arrests, and that the events in Wrightsville constituted extraordinary circumstances, might be found by a jury to excuse the lack of supervision of the booking entries by the arresting officers.

Nor is this case controlled by two earlier Fifth Circuit cases. The *Barnett* court distinguished *Staples v. U.S.*, 320 F.2d 817 (5th Cir.1963), and *Collins v. U.S.*, 289 F.2d 129 (5th Cir.1961), as cases that involve bookings specifically for "investigation" and "on suspicion" in which the subjects were detained on these fictitious charges until additional investigation could be carried out. Yet unlike *Davis v. Mississippi*, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969), where 24 black youths were briefly detained and fingerprinted after a rape assailant left fingerprints at the victim's house, the arrests here were not for the purpose of gathering evidence.

■ Finally, we reject the contention that a state court order, handed down in the course of the state's criminal prosecution of Wilson, Martin and Ben Wilcher and holding that their arrests were unconstitutional, collaterally estops Attaway. 6 Rec.

2. The test used by the district court may have been too strict. Other Georgia cases indicate that obstruction may occur where verbal abuse retards, delays or hampers an officer in the discharge of his duty, *Dumas v. State*, 159 Ga. App. 517, 284 S.E.2d 33 (1981), a fleeing suspect disobeys a command to halt, *Tankersley v. State*, 155 Ga.App. 917, 273 S.E.2d 862 (1980), or a person refuses to provide identification to an officer. *Hudson v. State*, 135 Ga.App. 739, 218 S.E.2d 905 (1975).

389, 391–92. Attaway's answer to one of plaintiffs' interrogatories concedes that Wilcher and plaintiffs Rouse, Smith and Horton were all arrested in the same circumstances. 6 Rec. 487–89. This concession, however, does not establish collateral estoppel.

■ A nonparty to a prior decision cannot be bound by it unless he had sufficient identity of interest with a party that his interests are deemed to have been litigated. *U.S. v. Jefferson County*, 720 F.2d 1511, 1517–18 (11th Cir.1983). *See also Wendland v. Commissioner*, 739 F.2d 580, 581 (11th Cir.1984); *Precision Air Parts, Inc. v. Avco Corp.*, 736 F.2d 1499, 1501 (11th Cir.1984); *U.S. v. Mulherin*, 710 F.2d 731, 740 (11th Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 1305, 79 L.Ed.2d 703 (1984); *Herring v. S.E.C.*, 673 F.2d 1191, 1193 (11th Cir.1982). Attaway, neither individually nor as sheriff, shared an identity of interest with the state of Georgia acting as prosecutor in the criminal case. Thus the trial court correctly declined to invoke collateral estoppel.

## III. The constitutionality of the arrests

Appellants Snell, Rouse, Horton, Davis, Linder, Martin and Wilson contend that their arrests on May 19 were unconstitutional and discuss at length the evidence that they say make them so. They leap over, without discussion, the procedural predicate for making this contention on appeal. They moved for a directed verdict but only as to jail conditions. They moved for judgment n.o.v. and for a new trial, alleging the unconstitutionality of their arrests. Rec. 590–97. Both motions were denied. Rec. 611–12. We affirm as to Horton, Snell, Rouse, Martin, and Wilson, and reverse as to Davis and Linder.

■ The sufficiency of the evidence supporting a jury verdict is not reviewable on appeal, nor may a motion for judgment n.o.v. be granted, unless a motion for directed verdict was made at the close of all the evidence. *Coker v. Amoco Oil Co.*, 709 F.2d 1433, 1437 (11th Cir.1983); *Guinn v. Southwest Wood Products, Inc.*, 597 F.2d 1018, 1024 (5th Cir.1979). In the absence of such a motion, "our inquiry is limited to whether there was *any* evidence to support the jury's verdict, irrespective of its sufficiency, or whether plain error was noted which, if not noticed, would result in a 'manifest miscarriage of justice.' " [3]

### A. Horton, Snell, Rouse and Martin

■ Attaway testified that on the evening of May 19 he arrested Rouse at the Burton house and may have arrested Martin there as well. T. 3170, 3321–22. Martin agreed that he was arrested at the Burton house along with Rouse. T. 2505. Attaway stated that he found a shotgun in the yard of the Burton house five or six feet away from Rouse and Martin. T. 3171, 3320. Garnto testified that earlier in the evening of May 19, as he patrolled South Valley Street, he encountered a "fired up" group of blacks including Rouse and Martin. Martin said to him "we'll get you tonight" whereupon a shout of approval went up from the group. T. 3023–24. Attaway said that this was why he arrested Rouse.

As to Horton and Snell, Attaway testified that he arrested them at Wilson's church. T. 3323. He stated that he found two long guns under a car parked five or six feet from the front door of the church, T. 3319–20, and that Horton and Snell were leaning against the car. T. 3323. Attaway indicated that a woman was also arrested there. *Id.* It appears that no one else was arrested in the vicinity of the church. Garnto testified that the shots that wounded him as he patrolled were fired from the area of the church, T. 3028–29, that at least a hundred shots came from the area of the church and the Clover house, T. 3030–31, and that he reported all this to Attaway in

---

3. Where, as here, there has been a motion for a new trial raising the sufficiency issue, our case-law states that the issue is "whether there was an 'absolute absence of evidence to support the jury's verdict.' " *Powell v. Merrimack Mutual Fire Insurance Co.*, 667 F.2d 26, 28 (11th Cir. 1982). We treat this as effectively a restatement of the "any evidence" standard.

the sheriff's office soon afterwards. T. 3033.

Thus the jury had before it evidence that there was a major disturbance in which at least a hundred shots were fired; that the arrests occurred the same evening as the disturbance; that two of these plaintiffs were arrested in the location where the shots were testified to have come from, and a third, shortly before his arrest, had threatened an officer later wounded; that few other people were at the sites of the arrests; and that guns were found lying in the open or scarcely hidden. This was some evidence of probable cause.[4]

### B. Davis and Linder

Attaway testified that Davis and Linder were arrested at the Davis house and that no guns were found in the vicinity. T. 3321. Garnto testified that Linder and Davis were part of the group that cheered when Martin threatened him. T. 3024. Attaway stated that these two plaintiffs were arrested for the Garnto incident as well as on the strength of outstanding warrants against them. T. 3324. However, appellees do not rely on these warrants on this appeal. Brief of Appellees at 35.[5]

 With respect to these two plaintiffs the jury lacked "any evidence" to support a finding of probable cause. Davis and Linder were not in a location from which shots had been fired, were not in the vicinity of guns, and had not themselves made any threat. Mere presence at the scene of a crime does not support a finding of probable cause. *U.S. v. Irurzun*, 631 F.2d 60, 63 (11th Cir.1980) (Unit B).

 Appellees argue that a doctrine of "exigent circumstances" justified all of the May 19 arrests in view of the emergency circumstances present that evening in

Wrightsville. However, this doctrine, when applicable, only excuses the need for warrants with respect to searches, *Steagald v. U.S.*, 451 U.S. 204, 221–22, 101 S.Ct. 1642, 1652–53, 68 L.Ed.2d 38 (1981); *Coolidge v. New Hampshire*, 403 U.S. 443, 454–55, 460, 478, 91 S.Ct. 2022, 2031–32, 2034, 2044, 29 L.Ed.2d 564 (1971); *U.S. v. Blasco*, 702 F.2d 1315, 1325–26 (11th Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 275, 78 L.Ed.2d 256 (1983) and *cert. denied*, —— U.S. ——, 104 S.Ct. 276, 78 L.Ed.2d 256 (1983), or entries. *Payton v. New York*, 445 U.S. 573, 583, 590, 100 S.Ct. 1371, 1378, 1382, 63 L.Ed.2d 639 (1980); *Warden v. Hayden*, 387 U.S. 294, 298, 87 S.Ct. 1642, 1645, 18 L.Ed.2d 782 (1967); *Pantoja-Soto*, 739 F.2d at 1523–24; *U.S. v. Burgos*, 720 F.2d 1520, 1525–26 (11th Cir.1983). The caselaw does not suggest that the doctrine supplies probable cause for warrantless arrests. *Cf. U.S. v. Watson*, 423 U.S. 411, 423–24, 96 S.Ct. 820, 827–28, 46 L.Ed.2d 598 (1976); *U.S. v. Newbern*, 731 F.2d 744, 747–48 (11th Cir.1984); *Burgos*, 720 F.2d 1520, 1525–26; *U.S. v. Tobon-Builes*, 706 F.2d 1092, 1101–02 (11th Cir.1983).

A judgment n.o.v. should have been entered on behalf of Davis and Linder in order to avoid a manifest miscarriage of justice.

### C. Wilson

Wilson was arrested some time after late afternoon on May 19. Attaway testified that Wilson began driving a station wagon around the courthouse with a number of passengers, singing and chanting "we're all fired up, not going to take no more." Attaway testified that after Wilson had drove around the courthouse a third or fourth time "Officer Garnto came in the office and I asked him to go out and arrest Rev. Wilson on the warrant I had [sworn

---

4. Martin and Horton had arrest warrants outstanding against them. In view of our disposition we need not decide whether these warrants provided some evidence supporting the jury's verdict.

In addition, given the discussion here and our treatment of the investigation issue in the preceding section, we need not consider appellants' renewed argument that the investigation book-

ing entry rendered these arrests unconstitutional.

5. Moreover, the litigants agree that the warrants were for the violation of a Georgia "criminal defamation" statute that the Georgia Supreme Court later ruled unconstitutional because of a 1974 U.S. Supreme Court decision. *Williamson v. State*, 249 Ga. 851, 295 S.E.2d 305 (1982).

out for interfering with an officer in the sheriff's office on April 7, 1980]." He added: "I was standing out at the edge of the street, by the carport so that I could see what was going on." T. 3165. Officer Garnto testified that upon seeing Wilson circle the square, he asked Attaway what Attaway was going to do. Attaway instructed him to arrest Wilson under the warrant. T. 3036–37. Wilson argues that his arrest was unconstitutional because the warrant relied on was invalid under Georgia law. He further argues that his arrest was impermissibly made for the purpose of inhibiting the exercise of First Amendment rights.

■ We need not decide whether the warrant was constitutionally defective nor under what, if any, circumstances an arrest pursuant to a defective warrant would constitute a constitutional tort. Compare *Baker v. McCollan*, 443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979); *Murray v. City of Chicago*, 634 F.2d 365, 366 (7th Cir.1981). Where the person arrested committed a misdemeanor in the presence of the arresting officers or where the officers had probable cause to believe that the person committed a felony, the arrest is valid whether the officers acted pursuant to a defective warrant or no warrant at all. *U.S. v. Rabinowitz*, 339 U.S. 56, 60, 70 S.Ct. 430, 432, 94 L.Ed. 653 (1950), *overruled on other grounds, Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969); *Carroll v. U.S.*, 267 U.S. 132, 156–57, 45 S.Ct. 280, 286–87, 69 L.Ed. 543 (1925); *U.S. v. Broward*, 594 F.2d 345, 350 (2d Cir.), *cert. denied*, 442 U.S. 941, 99 S.Ct. 2882, 61 L.Ed.2d 310 (1979); *U.S. v. Wilson*, 451 F.2d 209, 214–15 (5th Cir.1971), *cert. denied*, 405 U.S. 1032, 92 S.Ct. 1298, 31 L.Ed.2d 490 (1972); *U.S. v. Labowitz*, 430 F.2d 1308, 1309 (9th Cir.1970); *Hagans v. U.S.*, 315 F.2d 67, 69 (5th Cir.1963). We find from the evidence set out above describing the arrest that there was some evidence to support a jury finding that

Attaway made or participated in Wilson's arrest. Next, we turn to whether there was some evidence that Wilson had committed an offense in Attaway's presence.

Attaway testified that on the afternoon of April 7, 1980 Martin and Wilson came into his office with a black female named Mary Culver. Culver was the owner of a car that had recently been found wrecked and abandoned, Attaway stated, and the sheriff's office had asked her to come in. Attaway testified that Martin and Wilson came in and started talking about Culver having been the person driving the car. Attaway told them to "let us talk to her," whereupon Martin insisted "I'm telling you, she was driving the car." After Attaway told Martin to get outside because they were in the process of investigating who was driving the car, Martin refused to leave and Attaway put him in jail for obstructing an officer. Attaway said that Wilson left the office. Then, according to Attaway, Culver said "she was not driving the car, that they had told her to say that, but she was not driving the car." Attaway testified that she further stated that "Rick somebody was driving the car." Attaway testified that when two deputies brought Rick back to the sheriff's office he told them that he had been driving the car though he did not have a driver's license. During this time, Attaway further testified, he had released Martin from jail and told Wilson that he was going to make a case against him for obstructing an officer in the line of duty. T. 3137–40.

■ If the jury, as entitled, accepted Attaway's testimony as true [6] it had some evidence to conclude that Attaway had reasonable grounds to believe that Wilson had violated O.C.G.A. § 16–10–24 (1984), which provides that a person who "knowingly and wilfully obstructs or hinders any law enforcement officer in the lawful discharge of his official duties" is guilty of a misdemeanor.[7]

6. It conflicted sharply with Wilson's version of the events at the sheriff's office. *See* T. 1926–42.

7. *See supra* p. 1235. Whether lying to a law enforcement officer conducting an investigation constitutes obstruction or hindrance under § 16–10–24 is for the jury to decide. *Hudson v.*

▮ Finally, we cannot find as a matter of law that Wilson's arrest was made to inhibit the exercise of his First Amendment freedoms. We need not decide whether such an arrest would support a cause of action under 42 U.S.C. § 1983.[8] Even if it would, in this case the testimony just discussed as to the April 7 incident at the sheriff's office and Wilson's May 19 arrest supplies some evidence that Wilson's arrest was not made to inhibit the exercise of his First Amendment rights. Wilson was not entitled to a judgment n.o.v. or a new trial.[9]

## IV. Jail conditions

In the *Davis* and *Linder* actions the plaintiffs asserted that conditions in the Johnson County jail, where they were incarcerated, violated the Eighth and Fourteenth Amendments, entitling them to damages against Sheriff Attaway and the Johnson County Commissioners. These plaintiffs moved for a directed verdict and for judgment n.o.v. on this issue, relying in large part on a prior consent decree entered by the United States District Court for the Southern District of Georgia, which they say was violated. They assert as error the denial of their motions, T. 34–38, 3 Rec. 605–06, and the giving of jury instructions that an emergency might justify departure from the terms of the consent decree. T. 3654–55.[10]

The consent decree enforced a settlement in a separate class action brought on behalf of a class composed of jail detainees. It permanently enjoined Sheriff Attaway and named commissioners of Johnson County

from incarcerating any person in Johnson County jail without first having complied with a series of requirements, which included maximum capacities and the provision of medical treatment, blankets, linens, and uniforms to inmates lacking a change of clothes. T. 941–46.

Appellees concede that the jail was overcrowded. Approximately ten women plus a number of men that brought the total occupancy to between 30 and 40 persons (the exact number is unclear) were housed in the jail. The maximum capacity provided by the order was 12 persons. There was testimony as to other conditions that would violate the decree, including the failure to give hot meals at specified times, failure to treat and record particular medical problems, failure to give clean linens, failure to permit a change of clothing, and failure to permit calls to attorneys. By in large this testimony was subject to credibility determinations that a jury might make.

Appellees do not seriously contend that some requirements imposed by the decree as conditions on use of the jail were not complied with. Rather they contend that exigent or emergency circumstances permitted use of the jail without their being liable, by reason of the decree or otherwise. They refer us to this provision of the decree:

> Except for good cause shown to the court, the Defendant jail facility may not be used for incarcerating or detaining any person after January 15, 1979, unless all improvements required by this court have been completed.

State, 135 Ga.App. 739, 218 S.E.2d 905, 907 (1975).

**8.** Appellants cite cases acknowledging that "delaying an arrest as a pretext to apprehend a suspect when he has evidence in his possession may be constitutionally impermissible." *U.S. v. Cravero*, 545 F.2d 406, 413 (5th Cir.1976), *cert. denied*, 429 U.S. 1100, 97 S.Ct. 1123, 51 L.Ed.2d 549 (1977) and *cert. denied*, 430 U.S. 983, 97 S.Ct. 1679, 52 L.Ed.2d 377 (1977). These are plainly inapposite.

**9.** Appellants assert the First Amendment argument with respect to the arrests not only of Wilson, but of Snell, Rouse, Horton, Davis, Linder and Martin as well. Because these plain-

tiffs, unlike Wilson, were not engaged in protected First Amendment activities at the time of their arrests, we find no merit in this contention.

**10.** The court instructed the jury:

I further charge you that exigent circumstances or an emergency could warrant a departure from the requirements of a court order stating conditions of confinement at a jail if the public safety so demands. If such circumstances are found to exist, the responsible officials should return the jail to compliance with the order as soon as is practicable.

T. 945. Another provision precludes variation from the decree except upon further order of the court.

There are two issues before us. First, whether emergency or exigent circumstances could justify departing from the terms of the decree without liability [11], whether arising from violation of the decree or from the presence of unconstitutional conditions apart from the provisions of the decree. Second, if so, whether a jury issue was presented on whether such exigent or emergency conditions existed.

A series of cases acknowledge that emergency situations, especially with respect to conditions inside of jails, can justify otherwise unconstitutional practices. *See Hughes v. Rowe*, 449 U.S. 5, 11, 101 S.Ct. 173, 177, 66 L.Ed.2d 163 (1980); *Arroyo v. Schaefer*, 548 F.2d 47, 50 (2d Cir.1977); *Carlo v. Gunter*, 520 F.2d 1293, 1297 (1st Cir.1975); *Morris v. Travisono*, 509 F.2d 1358, 1360 (1st Cir.1975). *Cf., Lynch v. Baxley*, 386 F.Supp. 378, 387–88 (M.D.Ala. 1974), ("It cannot be seriously doubted that the state may on occasion have a compelling interest in the emergency detention of those who threaten immediate and serious violence to themselves or others."), *rev'd on other grounds*, 651 F.2d 387 (5th Cir. 1981) (Unit B).[12]

■ Given the events in Wrightsville on May 19, the brief period for which plaintiffs were incarcerated, testimony permitting the jury to conclude that no feasible alternatives to use of the particular jail existed [13], the absence of any recurring violation, and the matter of credibility determinations, we hold that a jury issue was presented.

The "good cause shown" provision of the decree, plus the provision that it be changed only by court order, would appear to require that ordinarily good cause be demonstrated to the court that issued the decree before a condition required by it is departed from. But, just as the issuing court could conclude after the event that an emergency was good cause, a separate court presented with whether violation of the decree may be a basis of liability could also do so.

**V. Directed verdict for the mayor**

In the *Wilson* case, which charges that Sheriff Attaway and various city and county officers wrongfully broke up the April 8 rally and beat the *Wilson* plaintiffs in the process, a directed verdict was granted in favor of Wrightsville Mayor Wombles.

■ It was stipulated that Wombles was not present at the April 8 incident, T. 2971–72, but personal participation is not required for liability for a civil rights deprivation. *Henzel v. Gerstein*, 608 F.2d 654, 658 (5th Cir.1979); *Sims v. Adams*, 537 F.2d 829, 831 (5th Cir.1976). *But see McLaughlin v. City of LaGrange*, 662 F.2d 1385, 1388 (11th Cir.1981) ("personal involvement," custom, or policy required), *cert. denied*, 456 U.S. 979, 102 S.Ct. 2249, 72 L.Ed.2d 856 (1982). Rather there must be some causal connection between the actions of the supervisory official and the alleged deprivation. *Henzel*, 608 F.2d at 658; *Sims*, 537 F.2d at 831; *Roberts v. Williams*, 456 F.2d 819, 831 (5th Cir.1972), *cert. denied*, 404 U.S. 866, 92 S.Ct. 83, 30 L.Ed.2d 110 (1971). The causal connection may be established where a history of widespread prior abuse puts the official on notice of the need for improved training or supervision. *Bowen v. Watkins*, 669 F.2d 979, 988 (5th Cir.1982); *Henzel*, 608 F.2d at

---

11. Plaintiffs' argument that the prior litigation giving rise to the decree estops defendants is meritless. They have not demonstrated that the issue of whether there is an emergency exception in the decree was actually litigated. *Williams v. Bennett*, 689 F.2d 1370, 1381 (11th Cir. 1982), *cert. denied*, —— U.S. ——, 104 S.Ct. 335, 78 L.Ed.2d 305 (1983).

12. This line of cases also disposes of the issue concerning whether the conditions of appel-

lants' incarceration constituted cruel and unusual punishment irrespective of the consent decree.

13. Although some of those arrested were moved to the Wrightsville city jail and plaintiffs contend that others could have been sent to jails in nearby towns, Attaway testified that "with everything going on" it would not have been feasible. T. 3236.

658 n. 5; *cf. Sims,* 537 F.2d at 831–32; *Roberts,* 456 F.2d at 831.

 The *Wilson* plaintiffs rely upon failure to adequately supervise and train the city police, established by either a prior history of abuse or by conduct so outrageous that a failure to supervise may be inferred. As prior history, they rely upon the testimony that on April 5 Police Chief Smith pushed and threatened Martin in the argument over directing traffic.

This argument is unpersuasive. In the first place the testimony of Martin, Smith, and the witnesses, who testified that Smith made a gesture of refusal and walked away, presented an issue of fact for the jury. Moreover, this single incident was neither a "history of abuse" nor so flagrant and outrageous [14] that it leads to an inference of failure by the mayor to supervise. The court did not err in directing a verdict for the mayor.

## VI. The Federal Rule of Evidence 403 contentions

In examining witnesses defense counsel referred to riots by blacks that occurred in Miami, Florida on or about May 17, 1980, to plaintiffs' counsel attorney's fees, and to communist involvement in the Wrightsville disturbances. Appellants say these references violated Fed.R.Evid. 403, which provides that relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.

 Although Rule 403 should be relied on "very sparingly," *Ebanks v. Great Lakes Dredge & Dock Co.,* 688 F.2d 716, 722–23 (11th Cir.1982), *cert. denied,* 460 U.S. 1083, 103 S.Ct. 1774, 76 L.Ed.2d 346 (1983); *Collins v. Seaboard Coast Line Railroad Co.,* 675 F.2d 1185, 1189 (11th Cir.1982), the trial court has wide discretion whether to exclude evidence un-

der it. *Noel Shows, Inc. v. U.S.,* 721 F.2d 327, 329 (11th Cir.1983); *Stallworth v. Illinois Central Gulf R.R.,* 690 F.2d 858, 868 (11th Cir.1982). Rule 403 objections, like other objections to the admission of evidence, are preserved only if they are timely and state "the specific ground of objection, if the specific ground was not apparent from the context." Fed.R.Evid. 103(a)(1); *U.S. v. Vitale,* 596 F.2d 688, 689 (5th Cir.), *cert. denied,* 444 U.S. 868, 100 S.Ct. 143, 62 L.Ed.2d 93 (1979); *Revlon, Inc. v. Buchanan,* 271 F.2d 795, 798 (5th Cir.1959). In addition, Rule 403 objections are waived if the objecting party later introduces evidence "of the same or similar import himself." *U.S. v. Truitt,* 440 F.2d 1070, 1071 (5th Cir.), *cert. denied,* 404 U.S. 847, 92 S.Ct. 150, 30 L.Ed.2d 84 (1971).

 As discussed below, appellants did not timely object to most of the evidence they now question but rather rely upon plain error. The plain error doctrine, Fed.R.Evid. 103(d), permits reversal despite the lack of an objection if there has been a "miscarriage of justice." *Morreale v. Downing,* 630 F.2d 286, 290 (5th Cir.1980); *see also, U.S. v. Pepe,* 747 F.2d 632, 675 (11th Cir.1984); Fed.R.Civ.P. 61.

### A. The Miami riots

 Appellants contend that the court improperly allowed defense counsel to refer several times to the May 19 Miami racial riots. For example, defense counsel cross-examined plaintiff Rouse as to whether she was "conscious ... that others in Miami, Florida, of your same race, on [the very night of the May 19 Wrightsville incident] were rioting and burning ... because of what they sensed to be injustice." T. 873.

Of the examples of such passages cited by appellants one provoked an objection merely to relevancy, T. 873–74, another en-

---

**14.** We assume without deciding that this second prong would be a basis for liability in the Eleventh Circuit. The Fifth Circuit has ruled that it is. *Bowen,* 669 F.2d at 989 ("In some cases ... the courts have viewed a single abuse as so flagrant that it gives rise to an inference that the supervisory official must have breached his duty of proper supervision) (citing *Owens v. Haas,* 601 F.2d 1242, 1246–47 (2d Cir.), *cert. denied,* 444 U.S. 980, 100 S.Ct. 483, 62 L.Ed.2d 407 (1979)).

tailed no objection at all, T. 1056, and a third came only after plaintiffs' counsel had asked the same witness about Miami on direct examination.[15] T. 1402–03, 1449–54, 1478–79. Subsequent Rule 403 objections, T. 1748–50, 2076–84, could not preserve error not previously objected to.

### B. Communist participation

The court permitted defense counsel to question witnesses about communist participation in the Wrightsville disturbances. For example, on cross-examination defense attorney Larsen asked one of plaintiffs' witnesses whether, during the April 8 demonstration, he was accompanied by the Revolutionary Communist Party or whether any group that demonstrated distributed the literature of or displayed the red banner of that group. T. 281–83.

■■■■ Plaintiffs were silent in the face of these inquiries, *see e.g.*, T. 281–83, 412–13, 520–21,˙1458, and themselves on several occasions raised the matter of communist participation. *See e.g.*, T. 515–17, 1644–45. Plaintiffs argue that a proper objection was made at T. 2077. At this point one of plaintiffs' counsel objected to references to events in Miami. In the process he cited a Smith Act case where "what one Communist leader said or did was held properly excluded in a conspiracy, even though Communist members of the same party were on trial." T. 2077–78. This was insufficient to call the court's attention to what plaintiffs were contending, especially in view of plaintiffs' own references to the subject. Moreover, there was no plain error.

---

15. Appellants also rely on an objection at T. 1164–66. This objection, however, occurred well after the first two references to the Miami riots appellants cite. While it does precede the third Miami reference cited, there was then no error to preserve since plaintiff's counsel had raised the subject of Miami in the direct examination of the witness, plaintiff Fred Taylor.

16. Appellants maintain that one of these witnesses—attorney Fullerton—was never counsel of record while a second—attorney Warren—had no interest in this case. This would not render defense counsel's inquiry into their financial interest improper.

### C. Attorney's fees

■■■■ Several attorneys for the plaintiffs[16] testified as witnesses. The court permitted defense counsel to cross-examine them as to attorney's fees. T. 586–93, 611–13, 715–20. This was not error. As to two of these colloquies, plaintiffs did not object. Moreover, the possible financial stake of a witness in a particular outcome of the case is a proper subject of cross-examination. *U.S. v. Reed*, 439 F.2d 1, 3–4 (2d Cir.1971); *U.S. v. Reed*, 437 F.2d 57, 59 (2d Cir.1971); *Wheeler v. U.S.*, 351 F.2d 946, 947 (1st Cir.1965). *See also, Ellis v. Capps*, 500 F.2d 225, 227 (5th Cir.1974); *Aetna Insurance Co. v. Paddock*, 301 F.2d 807, 812 (5th Cir.1962). Compare *U.S. v. Elorduy*, 612 F.2d 986, 989 (5th Cir.), *cert. denied*, 447 U.S. 910, 100 S.Ct. 2997, 64 L.Ed.2d 861 (1980).

### VII. The admissibility of Wilson's prior offense

On direct examination Wilson testified that civil rights protests he had been involved in had been non-violent, T. 1908–09, and that he had been locked up around 50 times. T. 2000–01. On cross-examination the court permitted the defense to inquire into whether Wilson had ever pleaded guilty to simple battery under Georgia law. T. 2005–10.

Wilson says that under Georgia's First Offender statute, O.C.G.A. § 42–8–60 *et seq.* (1982 & Supp.1984), he was deemed to have been "rehabilitated" of the prior offense and therefore under Fed.R.Evid. 609(c)[17] the offense could not be used to impeach him.

---

17. Fed.R.Evid. 609(c) provides as follows:

(c) Effect of pardon, annulment, or certificate of rehabilitation. Evidence of a conviction is not admissible under this rule if (1) the conviction has been the subject of a pardon, annulment, certificate of rehabilitation, or other equivalent procedure based on a finding of the rehabilitation of the person convicted, and that person has not been convicted of a subsequent crime which was punishable by death or imprisonment in excess of one year, or (2) the conviction has been the subject of a pardon, annulment, or other equivalent procedure based on a finding of innocence.

■ There were two objections to defense counsel's inquiry into Wilson's prior conviction. First, he objected that "no foundation has been laid," explaining that "the only proper way to impeach a witness is a certified copy of the conviction and plea." T. 2006. However, under Fed.R. Evid. 609(a) a certified copy of the conviction is not required if evidence of the conviction is elicited during cross-examination. *U.S. v. Scott,* 592 F.2d 1139, 1142–43 (10th Cir.1979). *Cf. U.S. v. Knight,* 607 F.2d 1172, 1176–77 (5th Cir.1979) (finding no error in cross-examination as to prior offense); *U.S. v. Tumblin,* 551 F.2d 1001, 1004 (5th Cir.1977) (same). Counsel next made an objection that, though abstruse, arguably raised the application of the Georgia First Offender statute.

■ The Georgia First Offender statute, as enacted at time of trial, authorized the court to place on probation a defendant who pleads guilty "without entering a judgment of guilt." O.C.G.A. § 42–8–60 (1982). Upon fulfillment of the terms of probation, the defendant is discharged. The discharge "shall completely exonerate the defendant of any criminal purpose and shall not affect any of his civil rights or liberties," and "the defendant shall not be considered to have a criminal conviction." O.C.G.A. § 42–8–62 (1982). Completion of probation without violation "permits the offender complete rehabilitation without the stigma of a felony conviction." *State v. Wiley,* 233 Ga. 316, 210 S.E.2d 790, 791 (1974). *See also Stephens v. State,* 152 Ga.App. 591, 263 S.E.2d 477, 477–48 (1979), *rev'd on other grounds,* 245 Ga. 835, 268 S.E.2d 330 (1980).

Nevertheless, the statute does not provide for rehabilitation within the meaning of Rule 609(c). In *U.S. v. Wiggins,* 566 F.2d 944 (5th Cir.), *cert. denied,* 436 U.S. 950, 98 S.Ct. 2859, 56 L.Ed.2d 793 (1978), the Fifth Circuit held that Rule 609(c) reflects "a desire to accord a controlling con-

sideration to rehabilitation as opposed to executive grace or judicial invalidation." Thus the court ruled that a defendant's release from a halfway house where he had been placed as a condition of probation did not bar using the conviction for impeachment. The release, the court said, "was not shown to be 'based on a finding of the rehabilitation of the person convicted' within the literal requirement of Rule 609(c). Neither the program and objectives of the institution nor the qualification required for release are demonstrated." *Id.* at 946. *Cf. U.S. v. Jones,* 647 F.2d 696, 700 (6th Cir.) (pardon does not prove rehabilitation), *cert. denied,* 454 U.S. 898, 102 S.Ct. 399, 70 L.Ed.2d 214 (1981). Compare *Mills v. Estelle,* 552 F.2d 119, 121 (5th Cir.) (under Texas first offender statute specifically barring impeachment, prior offense inadmissible), *cert. denied,* 434 U.S. 871, 98 S.Ct. 214, 54 L.Ed.2d 149 (1977); *U.S. v. Thorne,* 547 F.2d 56 (8th Cir.1976) (finding of rehabilitation without certificate of any nature).

Georgia's First Offender statute does not involve a "finding of rehabilitation" under *Wiggins.* Georgia courts have held that first offender convictions may be used to impeach prosecution witnesses. *See Gilstrap v. State,* 250 Ga. 814, 301 S.E.2d 277, 279 (1983); *Favors v. State,* 234 Ga. 80, 214 S.E.2d 645, 651 (1975).

Also, Georgia courts have upheld relying on first offender convictions to discharge public employees. The First Offender statute, these cases observe, does not eradicate the facts underlying the offense. *Dominy v. Mays,* 150 Ga.App. 187, 257 S.E.2d 317 (1979); *Johnson v. GMC,* 144 Ga.App. 305, 241 S.E.2d 30, 31 (1977), *cert. denied,* 437 U.S. 905, 98 S.Ct. 3092, 57 L.Ed.2d 1135 (1978).

Accordingly, there was no error.[18]

VIII. Ensley's report and testimony

The court refused to admit, under Fed.R. Evid. 803(8)(C),[19] a report prepared by Rob-

---

**18.** Appellants have not questioned whether Wilson's conviction satisfies Rule 609(a)(1) or (2).

**19.** Fed.R.Evid. 803(8)(C) provides, notwithstanding the availability of the declarant, for the admissibility of

ert Ensley and also would not order him to appear and testify for plaintiffs. The transcript indicates that the plaintiffs had issued a subpoena to take the deposition of Ensley, which the trial court had quashed because it had only been served a day in advance and had not been served on the Justice Department. The Justice Department had also obtained a protective order barring Ensley from being a trial witness. T. 1546–47. Ensley, an observer and mediator for the Community Relations Service ("CRS"), witnessed the altercation on April 8. CRS, part of the Department of Commerce, is charged by Congress with helping communities resolve disputes relating to discriminatory practices. 42 U.S.C. § 2000g–1 *et seq.* (1982).

The court ruled Ensley's report inadmissible for a variety of reasons: because the report was "strong," "suspect because of its brevity," dealt with the "ultimate issue," failed to afford the possibility of cross-examination, and the probability of harm by its admission greatly outweighed its probative value. T. 1545–46. Also because the report was conclusory and "a synopsis of one man's thoughts"; because Ensley was "physically available" within 100 miles and so subject to subpoena, a motion for which the court indicated it would "entertain with more interest and more probability of success." T. 1712–13.

■ The discretion of the trial court concerning admissibility of evidence applies to determinations of admissibility under Rule 803(8)(C). *In re Plywood Antitrust Litigation,* 655 F.2d 627, 637 (5th Cir.1981) (Unit A), *cert. dismissed,* 462 U.S. 1125, 103 S.Ct. 3100, 77 L.Ed.2d 1358 (1983); *Control Components, Inc. v. Valtek, Inc.,* 609 F.2d 763, 769 (5th Cir.), *cert. denied,* 449 U.S. 1022, 101 S.Ct. 589, 66 L.Ed.2d 484 (1980).

■ We find no abuse of discretion. The trial court's remarks about the report reveal that it made a deliberate and advised determination to exclude the report under Fed.R.Evid. 403. Moreover, the statute creating the community relations service specifies that the activities of CRS employees "shall be conducted in confidence and without publicity." 42 U.S.C. § 2000g–2(b).

■ The court's subsequent refusal to permit Ensley to be required to testify was also not an abuse of discretion. Appellants argue that Ensley's testimony was important because it would have corroborated statements of other witnesses for plaintiffs and countered the implication of defense counsel that Ensley helped cause the violent April 8 conflict. However, Ensley's role, if any, in causing the conflict bears only indirectly on whether defendants acted improperly.

Before ruling on this matter, the trial judge examined Ensley on the phone regarding his prospective testimony. The judge found that the testimony was not required "to insure that justice be done," simply added "a little more to each side of an already copiously examined controversy," "perhaps even confuses the matter somewhat further," and that part of it would be against the "great weight of the evidence." The court further stated that were Ensley called, the CRS would be "substantially embarrassed and rendered less effective in the performance of their mission." T. 3389–91. We have already noted the statutory purpose of confidentiality and lack of publicity. The court's conclusion is reinforced by the appearance before the court as it deliberated on this issue of Ms. Padgett, representing CRS for the United States Department of Justice. Padgett requested the court not to enforce any order requiring Ensley to testify because his testimony could taint the impartiality of CRS and thereby undermine its conciliation and mediation process. T. 3383–84.

Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth ... (C) in civil actions and proceedings and against the Government in criminal cases, factual findings resulting from

an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.

### IX. The First Amendment instructions

The court charged the jury twice in regard to appellants' First Amendment claims in the *Wilson* and *Davis* cases. Appellants did not object but assert that this was plain error because First Amendment claims present questions of law properly decided by the court. This argument is rejected.

■ In instructing the jury in regard to the *Wilson* case, the court noted that "fighting" words are one narrow class of unprotected speech. Thus, the court continued, "if you should find by a preponderance of the evidence after considering their context that the words in question were words which by their very utterance tended to incite an immediate breach of the peace, then you may consider such words as unprotected by the Constitution's guarantee of freedom of speech." T. 3627–29.

■ This instruction was not improper. Whether words are "fighting" words, that is, words "which by their very utterance inflict injury or tend to incite an immediate breach of the peace," *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572, 62 S.Ct. 766, 769, 86 L.Ed. 1031 (1942), depends "upon the circumstances of their utterance." *Lewis v. City of New Orleans*, 415 U.S. 130, 135, 94 S.Ct. 970, 973, 39 L.Ed.2d 214 (1974) (Powell, J., concurring in the result). Thus, this circuit has treated the question of whether the tendency of words is to provoke violence as one of fact. *Lamar v. Banks*, 684 F.2d 714, 719–20 (11th Cir. 1982). *See also Hammond v. Adkisson*, 536 F.2d 237, 239–40 (8th Cir.1976).

With respect to the *Davis* case, the court stated that one of the federal law claims was based on the First Amendment, specified the protections of the amendment, and observed that the plaintiffs alleged that certain acts infringed these protections. T. 3653–54. This was obviously correct.

### X. Qualified immunity instructions

Appellants assert that the jury should not have been instructed as to qualified immunity because the defendants failed to timely plead the defense, they were not entitled to such immunity as a matter of law, and the defense raised no question of fact warranting its submission to the jury. We find no reversible error.

■ Qualified or "good faith" immunity generally shields government officials performing discretionary functions from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *Clark v. Beville*, 730 F.2d 739, 740 (11th Cir.1984). It is "an affirmative defense that must be pleaded by a defendant official." *Harlow*, 457 U.S. at 815 & n. 24, 102 S.Ct. at 2737 & n. 24; *Gomez v. Toledo*, 446 U.S. 635, 640, 100 S.Ct. 1920, 1923, 64 L.Ed.2d 572 (1980); *Berdin v. Duggan*, 701 F.2d 909, 913 n. 13 (11th Cir.), *cert. denied*, — U.S. ——, 104 S.Ct. 239, 78 L.Ed.2d 230 (1983); *Espanola Way Corp. v. Meyerson*, 690 F.2d 827, 830 (11th Cir.1982), *cert. denied*, 460 U.S. 1039, 103 S.Ct. 1431, 75 L.Ed.2d 791 (1983).

Defendants' seventh defense provided

This defendant has at all times acted in a reasonable and prudent manner in performing the duties of the office of this defendant, and this defendant has committed no wrong against the plaintiffs.

Assuming that this did not itself suffice to raise the defense, it is clear, because of the pre-trial order and subsequent events that the issue was in the case. The Proposed Consolidated Pre-Trial Order filed December 20, 1982, 2 Rec. 275, and signed by plaintiffs' attorney, 2 Rec. 304, stated that the plaintiffs contend that defendants have the burden of proof on each affirmative defense "including ... that of 'good faith.'" The order further states that plaintiffs advise the court "that the availability of the 'good faith' defense is an issue for the court to determine." 2 Rec. 291.

On January 7, 1983 the defendants requested a qualified immunity instruction. 2 Rec. 334, 336–39. On the same date,

plaintiffs submitted briefs arguing that qualified immunity was a matter of law for the court, 2 Rec. 314, and that "the defense of qualified immunity was not raised until defendants attempted to do so in the pre-trial order," and was therefore waived. 2 Rec. 345. Plaintiffs also requested a jury instruction relating what defendants would be obliged to prove to make out a "good faith" defense. 2 Rec. 371.

■ The belated contention by plaintiffs that the assertion of qualified immunity in the pre-trial order had come too late so that the issue had therefore been waived, itself came too late. The pre-trial order had recognized the existence of the issue; the belated contention merely suggests that it should not have done so. The court never ruled on this waiver argument but impliedly overruled it when it instructed the jury on the issue.

■ As for appellants' contention that as a matter of law defendants were not entitled to such immunity, we have upheld the jury's verdicts on every issue except the constitutionality of the arrests of Linder and Davis. Thus, with respect to the bulk of the issues, we cannot say that defendants violated any "clearly established" rights thereby precluding immunity as a matter of law. However, our holding that there was no evidence to support the jury's finding that the arrests of Linder and Davis were constitutional requires us to find that defendant did violate the "clearly established" rights of those two plaintiffs. Accordingly, defendants were not entitled to qualified immunity as a matter of law with respect to the arrests of Linder and Davis.

■ Finally, whether defendants' acts fell within the scope of their discretionary authority is a question of fact. *Espanola Way*, 690 F.2d at 830. Thus it was not error to submit the defense to the jury.

### XI. Closing argument of defense counsel

In closing argument defense counsel Larsen remarked that the plaintiffs and their attorneys had a purpose of enriching themselves. He went on to say that opposing counsel "want you to destroy [Wrightsville], to destroy these people, economically take away from them everything they've got for the enrichment of 20 odd lawyers and 50 odd people who felt offended." T. 3557. *See also* T. 3521, 3541, 3575, 3578, 3584, 3588. At another point Larsen related a joke about an attorney whose fee was either $10,000 or $5,000 depending on whether he or the client furnished the evidence. He added that "you can virtually see that in this case. These lawyers seek enrichment from their testimony." T. 3577–78. Larsen referred to witnesses for the plaintiffs as "outsiders," T. 3542, referred to the Miami riots, T. 3556, 3563, and ridiculed the idea that the Revolutionary Communist Party was nonviolent, in part, by referring to the Korean War. T. 3581–82.

Plaintiffs did not make proper objections. They refer to a single objection, made to an argument by defense counsel that some of plaintiffs' attorneys had testified, that they were seeking to share in a large recovery, and that if a verdict was returned for plaintiffs it would be "the duty of the court" to award them attorney's fees under the Civil Rights Act. Plaintiffs objected, and the gist of their objection was that this was a matter of law to be covered by instructions from the court and not by argument of counsel. The court responded immediately by stating that it would instruct the jury in this matter.

■ In large part, there was no error. The reference to the economic interests of plaintiffs and their attorneys was not improper. They sought damages plus attorney's fees. The argument about destroying the city and county economically was overblown, but the opposing economic interests of plaintiffs and their counsel and of the city and county were issues properly the subject of comment. Evidence concerning the Miami riots and Communist Party participation was in the case, and as we have pointed out above, not erroneously so. *See* Part VI, *supra.*

### XII. The unconstitutionality of the city charter

Plaintiffs, by an amendment to their complaint, requested a declaratory judgment that § 20 of the Wrightsville City Charter, authorizing arrests under various circumstances without a warrant, was unconstitutional on its face. The court found that § 20 was in clear violation of the Constitution and granted the request for declaratory relief. 6 Rec. 539–40. However, it did not include this relief in the judgment that it entered in the *Davis* case. 6 Rec. 576. Plaintiffs moved to amend the judgment to incorporate the declaratory relief. In their motion they stated that they were entitled to costs and attorney's fees necessary to the litigation of the charter issue. 6 Rec. 577. The trial court denied the motion to amend, ruling that plaintiffs were not "a prevailing party" under 42 U.S.C. § 1988 (1982) and therefore were not entitled to attorney's fees. 6 Rec. 580–81.

■■■ The refusal to amend the judgment was error. The *Davis* case plaintiffs are entitled to a judgment embracing the declaratory relief that they requested and that the court found they were entitled to.

■■■ The decision that plaintiffs were not entitled to attorney's fees with respect to the litigation of the charter issue was not an abuse of discretion. To be entitled to attorney's fees pursuant to 42 U.S.C. § 1988 one must be a "prevailing party" or a party who has been "successful on the central issue." *Miami Herald Publishing Co. v. City of Hallandale*, 742 F.2d 590, 591 (11th Cir.1984). As their complaints indicate, plaintiffs brought these suits principally to vindicate their civil rights with respect to the April 8 rally, their May 19 arrest, and their subsequent jail confinement. The constitutionality of the city charter does not bear upon the constitutionality of their arrests by a county sheriff. Thus it was not error to find that plaintiffs were not a "prevailing party" by reason of their success on this issue.

AFFIRMED in part, REVERSED in part, and REMANDED in part with instructions.